## ADAMS ET AL. *v.* TANNER, ATTORNEY GENERAL OF THE STATE OF WASHINGTON, ET AL.

**APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WASHINGTON.**

No. 273. Argued May 7, 1917.—Decided June 11, 1917.

The business of securing honest work for the unemployed in return for an agreed consideration is a useful and legitimate business which, though subject to regulation under the state police power, cannot be forbidden by an act of a State without violating the guaranty of liberty secured by the Fourteenth Amendment.

A law forbidding employment agents from receiving fees from the workers for whom they find places in effect destroys their occupation as agents for workers, and cannot be sustained upon the ground that the fees may be charged against employers.

Washington Initiative Measure Number 8 (popularly known as "The Employment Agency Law,") as construed by the Supreme Court of the State, is contrary to the Fourteenth Amendment.

Decree of the District Court reversed.[1]

THE case is stated in the opinion.

*Mr. Dallas V. Halverstadt,* with whom *Mr. Samuel H. Piles, Mr. Edward J. Cannon* and *Mr. George Ferris* were on the briefs, for appellants.

*Mr. L. L. Thompson,* Assistant Attorney General of the State of Washington, with whom *Mr. W. V. Tanner,* Attorney General of the State of Washington, was on the brief, for appellees.

---

[1] By an order of the District Court, the majority and minority opinions in *Wiseman* v. *Tanner,* 221 Fed. Rep. 694, were adopted in this case.

MR. JUSTICE MCREYNOLDS delivered the opinion of the court.

Initiative Measure Number 8—popularly known as "The Employment Agency Law"—having been submitted to the people of Washington at the general election, received a majority vote and was thereafter declared a law, effective December 3, 1914, as provided by the state constitution. (Laws of Washington, 1915, 1.) It follows:

"Be it enacted by the People of the State of Washington:

"Section 1. The welfare of the State of Washington depends on the welfare of its workers and demands that they be protected from conditions that result in their being liable to imposition and extortion.

"The State of Washington therefore exercising herein its police and sovereign power declares that the system of collecting fees from the workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion and is therefore detrimental to the welfare of the state.

"Section 2. It shall be unlawful for any employment agent, his representative, or any other person to demand or receive either directly or indirectly from any person seeking employment, or from any person on his or her behalf, any remuneration or fee whatsoever for furnishing him or her with employment or with information leading thereto.

"Section 3. For each and every violation of any of the provisions of this act the penalty shall be a fine of not more than one hundred dollars and imprisonment for not more than thirty days."

In *Huntworth* v. *Tanner*, 87 Washington, 670, the Supreme Court held school teachers were not "workers" within the quoted measure and that it did not apply to one conducting an agency patronized only by such teachers

and their employers.  And in *State* v. *Rossman*, 93 Washington, 530, the same court declared it did not in fact prohibit employment agencies since they might charge fees against persons wishing to hire laborers; that it was a valid exercise of state power; that a stenographer and book-keeper is a "worker"; and that one who charged him a fee for furnishing information leading to employment violated the law. .

As members of co-partnerships and under municipal licenses, during the year 1914 and before, appellants were carrying on in the City of Spokane well established agencies for securing employment for patrons who paid fees therefor.  November 25, 1914, in the United States District Court, they filed their original bill against W. V. Tanner, Attorney General of the State, and George H. Crandall, Prosecuting Attorney for Spokane County, asking that Initiative Measure Number 8 be declared void because in conflict with the Fourteenth Amendment, Federal Constitution, and that the defendants be perpetually enjoined from undertaking to enforce it.  On the same day they presented a motion for preliminary injunction supported by affidavits which were subsequently met by countervailing ones.  Appellees thereafter entered motions to dismiss the original bill because: (1) "Said bill of complaint does not state facts sufficient to warrant this court in granting any relief to the plaintiffs; (2) that plaintiffs have a plain, speedy and adequate remedy at law; (3) that this court has no jurisdiction over the persons of these defendants or either of them, or of the subject-matter of this action."  A temporary injunction was denied.  The motions to dismiss were sustained and a final decree to that effect followed.

Considering the doctrine affirmed in *Truax* v. *Raich*, 239 U. S. 33, and cases there cited, the record presents no serious question in respect of jurisdiction.

The bill alleges "that the employment business con-

sists in securing places for persons desiring to work" and unless permitted to collect fees from those asking assistance to such end the business conducted by appellants cannot succeed and must be abandoned. We think this conclusion is obviously true. As paid agents their duty is to find places for their principals. To act in behalf of those seeking workers is another and different service, although, of course, the same individual may be engaged in both. Appellants' occupation as agent for workers cannot exist unless the latter pay for what they receive. To say it is not prohibited because fees may be collected for something done in behalf of other principals is not good reasoning. The statute is one of prohibition, not regulation. "You take my house when you do take the prop that doth sustain my house; you take my life when you do take the means whereby I live."

We have held employment agencies are subject to police regulation and control. "The general nature of the business is such that unless regulated many persons may be exposed to misfortunes against which the Legislature can properly protect them," *Brazee* v. *Michigan*, 241 U. S. 340, 343. But we think it plain that there is nothing inherently immoral or dangerous to public welfare in acting as paid representative of another to find a position in which he can earn an honest living. On the contrary, such service is useful, commendable, and in great demand. In *Spokane* v. *Macho*, 51 Washington, 322, 324, the Supreme Court of Washington said: "It cannot be denied that the business of the employment agent is a legitimate business, as much so as is that of the banker, broker, or merchant; and under the methods prevailing in the modern business world it may be said to be a necessary adjunct in the prosecution of business enterprises." Concerning the same subject, *Ex parte Dickey*, 144 California, 234, 236, the Supreme Court of California said: "The business in which this defendant is engaged is not only innocent and

innocuous, but is highly beneficial, as tending the more quickly to secure labor for the unemployed. There is nothing in the nature of the business, therefore, that in any way threatens or endangers the public health, safety or morals." And this conclusion is fortified by the action of many States in establishing free employment agencies charged with the duty to find occupation for workers.

It is alleged: "That plaintiffs have furnished positions for approximately ninety thousand persons during the last year, and have received applications for employment from at least two hundred thousand laborers, for whom they have been unable to furnish employment. . . . That such agencies have been established and conducted for so long a time that they are now one of the necessary means whereby persons seeking employment are able to secure the same." A suggestion in behalf of the State that while a pursuit of this kind "may be beneficial to some particular individuals, or in specific cases, economically it is certainly non-useful, if not vicious, because it compels the needy and unfortunate to pay for that which they are entitled to without fee or price, that is, the right to work," while possibly indicative of the purpose held by those who originated the legislation, in reason, gives it no support.

Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skillfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the

fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked.

The general principles by which the validity of the challenged measure must be determined have been expressed many times in our former opinions. It will suffice to quote from a few.

In *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589, we held invalid a statute of Louisiana which undertook to prohibit a citizen from contracting outside the State for insurance on his property lying therein because it violated the liberty guaranteed to him by the Fourteenth Amendment. "The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

"If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law." *Booth* v. *Illinois,* 184 U. S. 425, 429.

"It is also true that the police power of the State is not unlimited, and is subject to judicial review, and when

exerted in an arbitrary or oppressive manner such laws may be annulled as violative of rights protected by the Constitution. While the courts can set aside legislative enactments upon this ground, the principles upon which such interference is warranted are as well settled as is the right of judicial interference itself. The legislature being familiar with local conditions is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power. . . . If there existed a condition of affairs concerning which the legislature of the State, exercising its conceded right to enact laws for the protection of the health, safety or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail." *McLean* v. *Arkansas*, 211 U. S. 539, 547, 548.

"The Fourteenth Amendment protects the citizen in his right to engage in any lawful business, but it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public. Neither does it prevent a municipality from prohibiting any business which is inherently vicious and harmful. But, between the useful business which may be regulated and the vicious business which can be prohibited lie many non-useful occupations, which may, or may not be harmful to the public, according to local conditions, or the manner in which they are conducted." *Murphy* v. *California*, 225 U. S. 623, 628.

We are of opinion that Initiative Measure Number 8 as

construed by the Supreme Court of Washington is arbitrary and oppressive, and that it unduly restricts the liberty of appellants, guaranteed by the Fourteenth Amendment, to engage in a useful business. It may not therefore be enforced against them.

The judgment of the court below is reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE McKENNA dissents upon the ground that under the decisions of this court—some of them so late as to require no citation or review—the law in question is a valid exercise of the police power of the State, directed against a demonstrated evil.

MR. JUSTICE BRANDEIS, dissenting

To declare the statute of a State, enacted in the exercise of the police power, invalid under the Fourteenth Amendment, is a matter of such seriousness that I state the reasons for my dissent from the opinion of the court.

The statute of the State of Washington, commonly known as the "Abolishing Employment Offices Measure" was proposed by Initiative Petition No. 8, filed July 3, 1914, and was adopted November 3, 1914, at the general election; 162,054 votes being cast for the measure and 144,544 against it. In terms the act merely prohibits the taking of fees from those seeking employment.[1]

---

[1] "An Act to prohibit the collection of fees for the securing of employment or furnishing information leading thereto and fixing a penalty for violation thereof.

"Be it enacted by the People of the State of Washington:

"Section 1. The welfare of the State of Washington depends on the welfare of its workers and demands that they be protected from conditions that result in their being liable to imposition and extortion.

Plaintiffs, who are proprietors of private employment agencies in the City of Spokane, assert that this statute, if enforced, would compel them to discontinue business and would thus, in violation of the Fourteenth Amendment, deprive them of their liberty and property without due process of law. The act leaves the plaintiffs free to collect fees from employers; and it appears that private employment offices thus restricted are still carrying on business.[1] But even if it should prove, as plaintiffs allege, that their business could not live without collecting fees

---

"The State of Washington therefore exercising herein its police and sovereign power declares that the system of collecting fees from the workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion and is therefore detrimental to the welfare of the state.

"Section 2. It shall be unlawful for any employment agent, his representative, or any other person to demand or receive, either directly or indirectly, from any person seeking employment, or from any person on his or her behalf, any remuneration or fee whatsoever for furnishing him or her with employment or with information leading thereto.

"Section 3. For each and every violation of any of the provisions of this act the penalty shall be a fine of not more than one hundred dollars and imprisonment for not more than thirty days."

The Supreme Court of Washington has twice passed upon the scope of the act; holding in *Huntworth* v. *Tanner*, 87 Washington, 670, that it is not applicable to teachers and in *State* v. *Rossman*, 93 Washington, 530, that it is applicable to stenographers and bookkeepers.

[1] See Report of the State of Washington Bureau of Labor (1915–1916), pp. 120–1.

"The free agencies, we are pleased to be able to say, are growing in popularity, and while they do not advertise their business with the same thrift that the other fellows did, they are coming into general service. There are three services of this kind: The private agency that receives all compensation from employers, either by the month, year, or per the service rendered; the federal agency, and the municipal agency; these latter two have offices in the larger places and are doing good work and the service is free to both employe and the employer. In the smaller cities and towns the federal is the prevailing agency and the postmaster of the place is usually the local representative."

from employees, that fact would not necessarily render the act invalid. Private employment agencies are a business properly subject to police regulation and control. *Brazee* v. *Michigan*, 241 U. S. 340. And this court has made it clear that a statute enacted to promote health, safety, morals or the public welfare may be valid, *although* it will compel discontinuance of existing businesses in whole or in part. Statutes prohibiting the manufacture and sale of liquor present the most familiar example of such a prohibition. But where, as here, no question of interstate commerce is involved, this court has sustained also statutes or municipal ordinances which compelled discontinuance of such businesses as (*a*) of manufacturing and selling oleomargarine, *Powell* v. *Pennsylvania*, 127 U. S. 678; (*b*) of selling cigarettes, *Austin* v. *Tennessee*, 179 U. S. 343; (*c*) of selling futures in grain or other commodities, *Booth* v. *Illinois*, 184 U. S. 425; (*d*) of selling stocks on margin, *Otis* v. *Parker*, 187 U. S. 606; (*e*) of keeping billiard halls, *Murphy* v. *California*, 225 U. S. 623; (*f*) of selling trading stamps, *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 368.

These cases show that the scope of the police power is not limited to regulation as distinguished from prohibition. They show also that the power of the State exists equally, whether the end sought to be attained is the promotion of health, safety or morals or is the prevention of fraud or the prevention of general demoralization. "If the State thinks that an admitted evil cannot be prevented except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the matter, they can see that it 'is a clear, unmistakable infringement of rights secured by the fundamental law.'" *Otis* v. *Parker*, 187 U. S. 606, 609; *Booth* v. *Illinois*, 184 U. S. 425, 429. Or as it is so frequently expressed, the action of the legislature is final, unless the measure adopted appears clearly to be arbitrary

or unreasonable or to have no real or substantial relation to the object sought to be attained. Whether a measure relating to the public welfare is arbitrary or unreasonable, whether it has no substantial relation to the end proposed is obviously not to be determined by assumptions or by *a priori* reasoning. The judgment should be based upon a consideration of relevant facts, actual or possible— *Ex facto jus oritur*. That ancient rule must prevail in order that we may have a system of living law.

It is necessary to enquire therefore: What was the evil which the people of Washington sought to correct? Why was the particular remedy embodied in the statute adopted? And, incidentally, what has been the experience, if any, of other States or countries in this connection? But these enquiries are entered upon, not for the purpose of determining whether the remedy adopted was wise or even for the purpose of determining what the facts actually were. The decision of such questions lies with the legislative branch of the government. *Powell* v. *Pennsylvania*, 127 U. S. 678, 685. The sole purpose of the enquiries is to enable this court to decide, whether in view of the facts, actual or possible, the action of the State of Washington was so clearly arbitrary or so unreasonable, that it could not be taken "by a free government without a violation of fundamental rights." See *McCray* v. *United States*, 195 U. S. 27, 64.

## 1. *The Evils.*[1]

The evils with which the people of Washington were confronted arose partly from the abuses incident to the

---

[1] The evils incident to private employment agencies first arrested public attention in America about 1890. During the fifteen years preceding the enactment of the Washington law there were repeated investigations, official and unofficial, and there was much discussion and experimentation. See Free Public Employment Offices in the United States, U. S. Bureau of Labor Bulletin No. 68, p. 1; Statistics of Unemployment and the Work of Employment Offices, U. S. Bureau

system of private employment agencies and partly from its inadequacy.

(a) *The abuses.*

These are summarized in a report published by the United States Bureau of Labor in October, 1912,[1] thus:

"Private employment agencies, which charge a fee for their services, are found in every city of any size in the United States. The nature of their business is such as to make possible most iniquitous practices. Their patrons are frequently men and women with only a dollar or two, which they are eager to give up for the opportunity of earning more. They are often of small intelligence and easily duped. Stories of how these agencies have swindled and defrauded those who sought employment through them are heard universally  Some of the more common of the fraudulent methods said to be used by these agencies are the following:

"1. Charging a fee and failing to make any effort to find work for the applicant.

"2. Sending applicants where no work exists.

"3. Sending applicants to distant points where no work or where unsatisfactory work exists, but whence the applicant will not return on account of the expense involved.

"4. Collusion between the agent and employer, whereby the applicant is given a few days work and then discharged to make way for new workmen, the agent and employer dividing the fee.

"5. Charging exorbitant fees, or giving jobs to such applicants as contribute extra fees, presents, etc.

"6. Inducing workers, particularly girls, who have been placed, to leave, pay another fee, and get a 'better job.'

of Labor Bulletin No. 109, p. 5; Subject Index of the U. S. Bureau of Labor Statistics, Bulletin No. 174, pp. 85–87; Munro, Bibliography of Municipal Government, pp. 379–381.

[1] United States Bureau of Labor Bulletin No. 109, p. 36.

"Other evils charged against employment agents are the congregating of persons for gambling or other evil practices, collusion with keepers of immoral houses, and the sending of women applicants to houses of prostitution; sometimes employment offices are maintained in saloons, with the resulting evils."

In the report to Congress of the United States Commission on Industrial Relations, created by Act of August 23, 1912, c. 351, 37 Stat. 415, which gave public hearings on the subject of employment offices, in May, 1914, the abuses are found to be as follows: [1]

"23. There are many private employment agents who try to conduct their business honestly, but they are the exception rather than the rule. The business as a whole reeks with fraud, extortion, and flagrant abuses of every kind. The most common evils are as follows:

"Fees are often charged out of all proportion to the service rendered. We know of cases where $5, $9, $10, and even $16 apiece has been paid for jobs at common labor. In one city the fees paid by scrubwomen is at the rate of $24 a year for their poorly paid work. Then there is discrimination in the charges made for the same jobs. Often, too, men are sent a long distance, made to pay fees and transportation, only to find that no one at that place ordered men from the employment agent. A most pernicious practice is the collusion with foremen or superintendents by which the employment agent 'splits fees' with them. That is, the foreman agrees to hire men of a certain employment agent on condition that one-fourth or one-half of every fee collected from men whom he hires be given to him. This leads the foreman to discharge men constantly in order to have more men hired through the

---

[1] Final Report and Testimony submitted to Congress by the Commission on Industrial Relations created by the Act of August 23, 1912, 64th Cong. 1st sess., Doc. 415, vol. I, pp. 109–111. See also vol. II, pp. 1165–1440.

agent and more fees collected. It develops the 'three-gang' method so universally complained of by railroad and construction laborers, namely, one gang working, another coming to work from the employment agent, and a third going back to the city.

"Finally, there is the most frequent abuse—misrepresentation of terms and condition of employment. Men are told that they will get more wages than are actually paid, or that the work will last longer than it actually will, or that there is a boarding house when there really is an insanitary camp, or that the cost of transportation will be paid, when it is to be deducted from the wages. They are not told of other deductions that will be made from wages; they are not informed about strikes that may be on at the places to which they are sent, nor about other important facts which they ought to know. These misrepresentations, it must be said, are often as much the fault of the employer as of the labor agent. Also the employer will place his call for help with several agents, and each will send enough to fill the whole order, causing many to find no jobs. Labor agents and laborers alike are guilty of the misuse of free transportation furnished by employers to prospective help. And it is true also that many applicants perpetrate frauds on the labor agents themselves, as, for example, causing them to return fees when positions actually were secured. This is the result of the general feeling that the whole system of paying fees for jobs is unjust; and if they must pay in order to get work, then any attempt to get the fee back is justifiable."

(b) *The Inadequacy.*

But the evils were not limited to what are commonly called abuses—like the fraud and extortion described above. Even the exemplary private offices charging fees to workers might prove harmful, for the reason thus stated in the report to Congress of the United States Commission on Industrial Relations, cited *supra.*

"18. . . . Investigations show, however, that instead of relieving unemployment and reducing irregularity, these employment agencies actually serve to congest the labor market and to increase idleness and irregularity of employment. They are interested primarily in the fees they can earn, and if they can earn more by bringing workers to an already overcrowded city, they do so. Again, it is an almost universal custom among private employment agents to fill vacancies by putting in them people who are working at other places. In this way new vacancies are created and more fees can be earned.

"19. They also fail to meet the problem because they are so numerous and are necessarily competitive. With few exceptions, there is no co-operation among them. This difficulty is further emphasized by the necessity of paying the registration fees required by many agencies; obviously the laborer can not apply to very many if he has to pay a dollar at each one.

"20. The fees which private employment offices must charge are barriers which prevent the proper flow of labor into the channels where it is needed and are a direct influence in keeping men idle. In the summer, when employment is plentiful, the fees are as low as 25 cents, and men are even referred to work free of charge. But this must necessarily be made up in the winter, when work is scarce. At such times, when men need work most badly, the private employment offices put up their fees and keep the unemployed from going to work until they can pay $2, $3, $5, and even $10 and more for their jobs. This necessity of paying for the privilege of going to work, and paying more the more urgently the job is needed, not only keeps people unnecessarily unemployed, but seems foreign to the spirit of American freedom and opportunity.

"21. An additional injustice inevitably connected with labor agencies which charge fees is that they must place

the entire cost of the service upon those least able to bear it. Employment agents say that employers will not pay the fees; hence they must charge the employees. Among the wage earners, too, however, those who are least in need and can wait for work, pay the least for jobs and even get them free, while those who are most in need make up for all the rest and pay the highest fees. The weakest and poorest classes of wage earners are therefore made to pay the largest share for a service rendered to employers, to workers, and to the public as well."

## 2. *The Remedies.*

During the fifteen years preceding 1914 there had been extensive experimentation in the regulation of private employment agencies. Twenty-four States had attempted *direct* regulation under statutes often supplemented by municipal ordinances.[1] Nineteen States had attempted *indirect* regulation through the competition of state offices, and seven others through competition of municipal

---

[1] "It is not necessary here to enter into the relative merits of governmental regulation and governmental operation. Suffice it to say that twenty-four States and the District of Columbia have attempted to regulate private employment agencies and have made a miserable failure of it. The business lends itself easily to fraud and imposition and it is far more true of the private agencies than of the public offices that they have been frauds as well as failures."

Public Employment Offices—W. M. Leiserson, 29 Political Science Quarterly (March, 1914), p. 36.

"The United States possesses at the present time no adequate system, either state or national, for the regulation of private employment agencies, either from the point of view of the content of the laws, affording regulations of the business and restrictions as to how the business shall be carried on, or as to proper methods of enforcement." [Labor Laws and Their Enforcement, edited by Susan M. Kingsbury (Boston, 1911), p. 366. See Chapter VI of this work for a study of the regulation of private employment agencies by Mabelle Moses. See also Chapter 663, Laws of 1913, State of Wisconsin.]

offices.[1]   Other experiments in indirect regulation through
competition were made by voluntary organizations, phil-
anthropic, social and industrial.[2]   The results of those
experiments were unsatisfactory.   The abuses continued
in large measure; and the private offices survived to a
great extent the competition of the free agencies, public
and private.   There gradually developed a conviction
that the evils of private agencies were inherent and in-
eradicable, so long as they were permitted to charge fees
to the workers seeking employment.   And many believed
that such charges were the root of the evil.

On September 25, 1914, the American Association of
Public Employment Offices adopted at its annual meeting
the following resolutions:

"*Resolved*, That this association go on·record as favoring
the elimination as soon as possible, of all private employ-
ment agencies operating for a profit within the United
States, and that it recommends to the consideration of·
the United States Commission on Industrial Relations
and Congress and the various State legislatures legislation
having this end in view."

The United States Commission on Industrial Relations
declared in its report to Congress: [3]

"24. Attempts to remove these abuses by regulation
have been made in 31 States, but with few exceptions they
have proved futile, and at most they have served only
to promote a higher standard of honesty in the business
and have not removed the other abuses which are inherent

---

[1] Proceedings of the Association of Public Employment Offices
(Sept. 25, 1914), U. S. Dep. of Labor, Bureau of Labor Statistics
Bulletin No. 192, p. 61.

[2] Unemployment and Work of Employment Offices, Bulletin of U. S.
Bureau of Labor No. 109, pp. 5, 37 (Oct., 1912).

[3] Made in August, 1915, and cited *supra*, p. 602, note 1.   Between
1914 and this date six States had legislated on the subject.   See Unem-
ployment Survey, 1914–1915.   5 American Labor Legislation Review,
p. 560.

in the system. Where the States and cities have spent much money for inspectors and complaint adjusters there has been considerable improvement in the methods of private employment agencies, but most of the officers in charge of this regulation testify that the abuses are in 'the nature of the business' and never can be entirely eliminated. They therefore favor the total abolition of private labor agencies. This is also the common opinion among working people, and in the several States attempts have already been made to accomplish this by law."

But the remedies proposed were not limited to the suppression of private offices charging fees to workers, and the extension of the systems of state and municipal offices. The conviction became widespread that for the solution of the larger problem of unemployment the aid of the Federal Government and the utilization and development of its extensive machinery was indispensable. During the seven years preceding 1914 a beginning had been made in this respect. The Immigration Act of February 20, 1907, c. 1134, 34 Stat. 898, 909, created within the Bureau of Immigration and Naturalization a Division of Information, charged with the duty of promoting "a beneficial distribution of aliens." The services rendered by this division included, among others, some commonly performed by employment agencies. While it undertook to place in positions of employment only aliens, its operations were national in scope. The Act of March 4, 1913, creating the Department of Labor, resulted in a transfer of the Bureau of Immigration, including the Division of Information, to that department. (37 Stat. 736.) By this transfer the scope of the division's work was enlarged to correspond with the broad powers of the Labor Department. These were declared by Congress to be: "to foster, promote and develop the welfare of the wage earners of the United States, to improve their

working conditions, and to advance their opportunities for profitable employment."

Then its efforts "to distribute" (that is both to supply and to find places for) labor were extended to include citizens as well as aliens; and much was done to develop the machinery necessary for such distribution. In the summer of 1914, and in part before the filing in the State of Washington of the proposal for legislation here in question, action had been taken by the Department of Labor which attracted public attention. It undertook to supply harvest hands needed in the Middle West and also to find work for the factory hands thrown out of employment by the great fire at Salem, Massachusetts, June 25, 1914.[1] The division was strengthened by co-operation with other departments of the Federal Government (Agriculture, Interior, Commerce, and the Post Office with its 60,000 local offices) and with state and municipal employment offices. As early as June 13, 1914, the United States Department of Labor had also sought the co-operation in this work of all the leading newspapers in America including those printed in foreign languages.[2]

---

[1] The fire was so extensive that the Congress appropriated $200,000 for relief of all sufferers. Act of August 1, 1914, c. 223, 38 Stat. 681.

[2] Annual Report of the Secretary of Labor, 1914, pp. 48–55; Monthly Review of the U. S. Bureau of Labor Statistics, July, 1915, p. 8; See also Annual Report of the Secretary of Labor, 1915, p. 36: "*Interdepartmental coöperation.*—Through the coöperation of the Post Office Department it became possible to bring to the aid of this labor-distribution service some 60,000 post offices and thereby to create a network of communication between employers needing help without knowing where to get it and workers wanting employment without knowing where to find it. Either employer or workman may obtain at any post office in the United States a blank application supplied by this department which, after filling out and signing it, he may deposit in the mails anywhere free of postage." "*Employment bulletins.*—The bulletins contain a statement of unmatched applications, no matter what part of the country they may come from. It is not expected, of course, that applications for work of a minor character will ordinarily

### 3. *Conditions in the State of Washington.*

The peculiar needs of Washington emphasized the defects of the system of private employment offices.

(a) *The evils.*

The conditions generally prevailing are described in a report recently published by the United States Department of Labor, thus:[1]

"In no part of the United States perhaps is there so large a field for employment offices as in the Pacific States. As has been noted, industrial conditions there favor inconstancy of employment. Much of the business activity is based upon the casual, short-time job. This in itself means the frequent shifting of workers from place to place. And the shifting is the more difficult, as much of the work offered is in more or less remote districts of the country. . . .

"The necessity laid upon so many workers of constantly seeking new jobs opens a peculiarly fertile field for their exploitation by unscrupulous private employment agencies. There is much testimony to the fact and frequency of such exploitation. The most striking evidence of this is that in the State of Washington private agencies made themselves so generally distrusted that in 1915 their complete abolition was ordered by popular vote. . . .

"Prior to 1914 there was practically no legislation regarding private employment agencies, and there had been no attempt at State supervision of their conduct. But

---

be matched by applications for workers of that kind from distant stations. It is assumed, however, that bulletined applications may possibly be matched through the coöperation of near-by stations within a reasonable radius. The bulletins are also systematically sent to such newspapers as have indicated their desire to receive them for possible publication as news matter of interest to their respective readers."

[1] Labor Laws and their Administration in the Pacific States. United States Department of Labor, Bureau of Labor Bulletin No. 211 (1917), pp. 17–18.

distrust of such agencies was constantly increasing and culminated in the year mentioned in the passage by popular initiative of an act aiming at the total suppression of all private employment agencies of the commercial type."

The reports of the Washington State Bureau of Labor give this description:

"The investigations of the Bureau show that the worst labor conditions in the state are to be found on highway and railroad construction work, and these are largely because the men are sent long distances by the employment agencies, are housed and fed poorly at the camps, and are paid on an average of $1.75 to $2.25 a day, out of which they are compelled to pay $5.50 to $7.00 per week for board, generally a hospital fee of some kind, always a fee to the employment agency and their transportation to the point where the work is being done. The consequence is that they usually have but little money left when the work is finished and if, as frequently happens, they work only a week or two and are then discharged they are in as bad a situation as they were before they went to work, and sometimes worse, if they do not have enough money to get back to the place from which they started." [1]

"That the honest toiler was their victim there is no question: not alone of a stiff fee for the information given but a systematic method was adopted in order to keep the business going. Managers of agencies and managers of jobs, their superintendents, foremen or sub-foremen, were in this scheme for fleecing the workingman. Men in large numbers would be sent to contract jobs and if on the railroads 'free fare' was part of the inducement, or perhaps the agency would charge a nominal fee if the distance was great and this, too, would become a perquisite of the

---

[1] Washington State Bureau of Labor. Report 1913–14, pp. 27–28.

bureau to finally go through the clearing house. In many cases men would be unsatisfactory, at least they would be told so, discharged in a few days and sent adrift as poor, may be poorer, than when they came there. New men would have to be secured, and thus the thing would go on revolving. So it went until at last it became so obnoxious that the public indignation was at length aroused, resulting in the passing of a law doing away with them." [1]

The abuses and the inadequacy of the then existing system are also described by state officials in affidavits included in the record.

(b) *The remedies.*

Washington had not tried direct regulation of private employment offices; but that method was being considered as late as 1912. [2] Its people had had, on the other hand, exceptional opportunities of testing public employment offices. The municipal employment office established at Seattle in 1894 under an amendment of the city charter is among the oldest public offices in the United States. Takoma established a municipal office in 1904, Spokane in 1905 and Everett in 1908. [3] The continuance and increase of these municipal offices indicate that their experience in public employment agencies was at least encouraging. And the low cost of operating them was extraordinary. In Spokane the fees charged by private agencies ranged from $1 upward and were usually about

[1] Washington State Bureau of Labor. Report 1915–16, p. 120.

[2] Washington State Bureau of Labor, 1911–1912. Report of Commissioner, p. 16: "It has been demonstrated that state control of employment agencies is the most effective way to properly regulate them. I would earnestly recommend a state law similar to the one in Illinois that went into effect July 1, 1911, and has proven to be the best law for this purpose in this country."

[3] The first free public employment office in the United States was the municipal agency established in Cleveland in 1890. Then followed (in 1893) the Los Angeles office. Bulletin of United States Bureau of Labor No. 68, p. 1 (Jan. 1907).

$2.[1]   In the Seattle free municipal agency the cost of operation, per position filled, was reduced to a trifle over 4 cents.[2]   The preliminary steps for establishing "Distribution Stations" under the federal system, including one at Seattle, had been taken before the passage of the Washington law.[3]   Later branch offices were established in thirteen other cities.[4]

---

[1] Washington State Bureau of Labor Report 1913–14; p. 291.

W. D. Wheaton, Labor Agent.—"The complaint against the private office is almost universal. The experience of this office is that private agencies charge all that the traffic will bear and that in hard times, when work is scarce and the worker poverty stricken, the fee is placed so high as to be almost prohibitive, and the agencies take longer chances, sometimes sending men on only a rumor, depending on their financial straits to make it impossible to return.

"The fees charged run from $1.00 for the poorest job of uncertain duration to as high as 10 per cent. of the first year's salary in educational lines, and 30 per cent. of the first month's salary in office or mercantile lines. Most of the agencies catering to the better class of positions charge a registration fee which is worked to the limit—or rather without limit. Advertisements for attractive positions are placed with the newspapers and registration is made of all that apply, irrespective of whether the position has been filled or not, and generally at a fee of $2.00 or more. This registration fee is always followed by a percentage of the earnings when a position is secured, but only a small proportion of those registering are placed in positions.

"The average charge per position in all agencies will run high, and yet the applicant cannot having a feeling of security in the position obtained for the reason that the great majority of private agencies are primarily interested in the fee and are not as careful in placing applicants as they would be did the possibility of another fee not exist."

[2] United States Bureau of Labor Bulletin No. 109, p. 136.

"The extremely low cost of each position filled is noteworthy, as is the large number of positions secured. A total of 37,834 positions were filled in 1906, and in 1909, 38,846. The cost per position was lowest in 1906, only 4.03 cents. Only twice since 1897 has the average cost gone above 6 cents."

[3] See Report of Secretary of Labor, 1914, p. 51.

[4] Aberdeen, Bellingham, Custer, Everett, Friday Harbor, Lynden, Noosack, North Yakima, Port Angeles, Port Townsend, Spokane,

## 4. *The Fundamental Problem.*

The problem which confronted the people of Washington was far more comprehensive and fundamental than that of protecting workers applying to the private agencies. It was the chronic problem of unemployment—perhaps the gravest and most difficult problem of modern industry—the problem which, owing to business depression, was the most acute in America during the years 1913 to 1915.[1] In the State of Washington the suffering from unemployment was accentuated by the lack of staple industries operating continuously throughout the year and by unusual fluctuations in the demand for labor with consequent reduction of wages and increase of social unrest.[2] Students of the larger problem of unemployment appear to agree that establishment of an adequate system of employment offices or labor exchanges[3] is an in-

Takoma, Walla Walla. Monthly Review of U. S. Labor Statistics, July, 1915, p. 9. See Report of Secretary of Labor, 1915, p. 36; 1916, p. 54. Hearings Committee on Labor, on H. R. 5783, to establish a National Employment Bureau. 64th Cong., 1st sess., February, 1916, p. 49.

[1] The Unemployment Crisis of 1914–1915, 5 American Labor Legislation Review, p. 475.

[2] Washington State Bureau of Labor Report, 1913–1914, pp. 13, 16–17. Unemployment Survey, 5 American Labor Legislation Review, 482, 483 (1915).

[3] Recent Advances in the Struggle against Unemployment, by Prof. Charles R. Henderson, 2 American Labor Legislation Review, 105, 106 (1911). "The point of starting ameliorative effort is the employment agency or 'labor exchange.'"

"When we compare the ordinary employment office with the board of trade for cotton or grain, or with the bankers' clearing-house, we begin to realize how belated, rudimentary and primitive our present labor exchange is. Yet the issues at stake are quite as vital in the case of demand and supply in the labor market as in the stock and grain exchange."

A Problem of Industry, 4 American Labor Legislation Review, p. 211:

"The labor market is unorganized, resulting in confusion, waste and

dispensable first step toward its solution. There is reason to believe that the people of Washington not only considered the collection by the private employment offices of fees from employees a social injustice; [1] but that they considered the elimination of the practice a necessary

---

loss to employers and employees. It means suffering to individual workers and their families, a lowering of the standard of living, impaired vitality and efficiency, and a tendency for the unemployed to become unemployable, dependent, degraded. In fact, the demoralizing effect of unemployment upon the individual is matched only by its wastefulness to society."

The Prevention of Unemployment, 5 American Labor Legislation Review, p. 176:

"An essential step toward a solution of the problem of unemployment is the organization of the labor market through a connected network of public employment exchanges. This is vitally important as a matter of business organization and not of philanthropy. It is of as much importance for the employer to find help rapidly and efficiently as it is for the worker to find work without delay. The necessity of organized markets is recognized in every other field of economic activity, but we have thus far taken only timid and halting steps in the organization of the labor market. The peddling method is still, even in our 'efficient' industrial system, the prevalent method of selling labor. Thus a purely business transaction is carried on in a most unbusiness-like, not to say medieval manner."

Public Employment Bureaus, Charles B. Barnes, 5 American Labor Legislation Review, p. 195:

"Unemployment is no longer intermittent in this country; it has come to be a chronic condition which needs to be dealt with in a regular and systematic manner. The first step in properly dealing with this situation is the establishing of a series of coöperating public employment bureaus."

The Unemployed in Philadelphia, Department of Public Works (1915), p. 113.

What is done for the Unemployed in European Countries; U. S. Bureau of Labor Bulletin No. 76, pp. 741–934; The British System of Labor Exchanges, U. S. Bureau of Labor Statistics, No. 206.

[1] Washington State Employment Agency Referendum, by W. M. Leiserson, 33 Survey, 87 (October 24, 1914):

"Any one who knows the employment agency business and every

preliminary to the establishment of a constructive policy for dealing with the subject of unemployment.[1]

It is facts and considerations like these which may have led the people of Washington to prohibit the collection by employment agencies of fees from applicants for work. And weight should be given to the fact that the statute has been held constitutional by the Supreme Court of Washington and by the Federal District Court (three judges sitting)—courts presumably familiar with the local conditions and needs.

In so far as protection of the applicant is a specific pur-

one who has tried earnestly to regulate private agencies will testify to the futility of regulation.

"But the inherent justice of the proposed Washington act can be shown in a better way. Ask the employment agent to whom he rendered the service and he will answer 'to employer and to employe.'

"'Then why don't you charge the employer?'

"'It is impossible. If we depended upon employers for our fees, we would have to go out of business. They simply will not pay.'

"Every time this question is put to employment agents the answer is the same: 'We charge the worker because we can get the fee from him and we cannot get it from the employer.'

"This is the downright wrong against which Washington initiative No. 8 is directed."

[1] General Discussion on Unemployment, 5 American Labor Legislation Review, p. 451; T. S. McMahon, Univ. of Washington.

"The people of the state of Washington are not indifferent to the problem of unemployment nor do they show any tendency to offer charitable panaceas as a permanent remedy. They are trying to work out some constructive policy, and as a preliminary step have made it illegal for employment offices to charge fees for jobs.

"A bill will be presented to the next legislature for the establishment of a network of public employment offices all over the state. This will make possible the complete organization of the labor market, which we hope is the first step toward the organization of industry itself.

"The aggressive attitude of the leaders among the workers has impressed upon the mind of the people the fact that the problem will have to be met in another way than by providing food and clothing for a period of distress such as we are passing through at the present time.

"I believe that this attitude on the part of the working people, which

pose of the statute—a precedent was furnished by the Act of Congress, December 21, 1898, 30 Stat. 755, 763 (considered in *Patterson* v. *Bark Eudora*, 190 U. S. 169) which provides, among other things:

"If any person shall demand or receive, either directly or indirectly, from any seaman or other person seeking employment as seaman, or from any person on his behalf, any remuneration whatever for providing him with employment, he shall for every such offence be liable to a penalty of not more than one hundred dollars."

In so far as the statute may be regarded as a step in the effort to overcome industrial maladjustment and unemployment by shifting to the employer the payment of fees, if any, the action taken may be likened to that embodied in the Washington Workmen's Compensation Law (sustained in *Mountain Timber Co.* v. *Washington*, 243 U. S. 219) whereby the financial burden of industrial accidents is required to be borne by the employers.

As was said in *Holden* v. *Hardy*, 169 U. S. 366, 387:

"  .  .  .  in view of the fact that from the day Magna Charta was signed to the present moment, amendments to the structure of the law have been made with increasing frequency, it is impossible to suppose that they will not continue, and the law be forced to adapt itself to new conditions of society, and, particularly to the new relations between employers and employés as they arise."

In my opinion, the judgment of the District Court should be affirmed.

MR. JUSTICE HOLMES and MR. JUSTICE CLARKE concur in this dissent.

---

is characteristically western, will do more towards the solution of this problem than perhaps we, who discuss it in a theoretical way, can accomplish. They do have some plan of action, and some definite program. Either we shall have to work out some program of ultimate solution of unemployment, or we will have to accept the solution they are offering us. The one they are offering us is socialism."