## 10098

### STATE v. FERRI *ET AL.*
### (97 S. E. 512.)

STATUTES—SPECIAL LEGISLATION — SEED COTTON TRAFFIC.—Act February
15, 1916 (29 St. at Large, p. 656), prohibiting traffic in seed cotton
or unpacked lint cotton within counties containing cities of 50,000
inhabitants or more, between August 1st and December 31st of any
year, is special legislation, and hence unconstitutional; there being
only one county in State with city of such population, and there being
no reason why law regulating seed cotton traffic in such county should
be different from that affecting other counties where such traffic is
regulated by Cr. Code 1912, sec. 454, applying to State as a whole.

Before PEURIFOY, J., Charleston, Fall term, 1917. Re-
versed.

Emelio Ferri and Isaiah Murray were convicted, respec-
tively, of buying and selling lint seed cotton during pro-
hibited season in violation of act February 15, 1916, and
they appeal.

*Messrs. H. L. Erckman* and *B. H. Matthews,* for defend-
ants-appellant, submit: *Is this statute special legislation and
a denial of the equal protection of the laws?* 64 S. C. 194;
94 S. C. 444; 99 S. C. 377. *Is the statute unconstitutional
on other grounds?* 84 S. C. 279; 106 S. C. 102; 80 S. C.
153; 244 U. S. 590; 211 U. S. 539; 245 U. S. 60; 42 S. C.
222; 123 U. S. 660; 18 S. C. 103; Corpus Juris, vol. XII,
945. *Is the statute in question merely a regulation?* 41
S. C. 244; 143 U. S. 517; 113 U. S. 27; 113 U. S. 703;
82 Fed. Rep. 623.

*Solicitor Thomas P. Stoney* and *Mr. Augustine T. Smythe,*
for the State. *Mr. Smythe* submits: *The statute is not spe-
cial legislation:* 64 S. C. 194; 12 Corpus Juris, p. 1134; 65
S. W. (Tenn.) 871; 56 S. W. 834; 156 N. W. 975. *There
is a reasonable basis for the classification created by this
statute:* 21 S. C. 292; 68 Ala. 58; 9 S. E. (S. C.) 338; 11
S. E. (S. C.) 545; 40 S. E. (S. C.) 970; 54 S. E. (S. C.)

970; 54 S. E. (S. C.) 363; 67 S. C. 1070; 76 S. E. (S. C.) 111; 220 U. S. 61; 218 U. S. 36-52; 12 Corpus Juris 1129-1130.

November 15, 1918.

The opinion of the Court, *en banc,* was delivered by MR. JUSTICE WATTS.

This is an appeal from conviction and sentence of the defendants. This is a case brought by the State against the defendants on the 18th day of September, 1917, on a warrant issued by the magistrate for Johns Island, charging the defendant, Isaiah Murray, with selling, and the defendant, Emelio Ferri, with buying, 25 pounds of lint seed cotton for $1.50 in contravention of the act of February 15, 1916, which reads as follows, the penalty clause being omitted:

"Section 1. *Traffic in Seed Cotton in Certain Counties Prohibited for Certain Period.*—Be it enacted by the General Assembly of the State of South Carolina, That the traffic by purchase, barter or exchange in all or any seed cotton or unpacked lint cotton, whether long cotton, known as sea island cotton, short staple cotton, or any other class, kind, staple, grade, or description of cotton whatsoever, within counties containing cities of fifty thousand inhabitants or more, in the State of South Carolina, between August 1st and December 31st of any year, is hereby declared against the public welfare, and is prohibited, and it shall be unlawful to issue any license for such purpose."

The defendants demurred to the indictment or warrant at the trial, and asked for a directed verdict on the ground that the act was unconstitutional, being repugnant to the United States Constitution and the State Constitution 1895, in that it seeks to abridge the privileges and immunities of citizens, prevents them from disposing of their property, deprives them of their liberty of carrying on a useful and legitimate business, deprives them of their rights of property, and

denies to them the equal protection of the laws. Both these motions were overruled and the defendants were convicted and fined $10 each.

The case was appealed to the Circuit Court and was argued before his Honor, Judge Peurifoy, who sustained the judgment of the magistrate, and declared the said act constitutional on the ground that the statute was not special legislation and was not prohibitive, but merely a regulation, and from this decree the defendants have appealed to this Court:

The exceptions, six in number, raise the question that the statute is special legislation and a denial of the equal protection of the laws.

We will consider the question: "Is this statute special legislation?"

It looks like the act in question shows on its face that it is a clear attempt to violate the Constitution. In making the classification to apply to counties containing cities of 50,000 or more, there must be shown that there is something different in their needs from that of counties having cities of less than 50,000.

The classification as to buying of seed cotton in this State applies to Charleston county alone, and it may be a long time before any other counties have the requisite number of citizens in cities, to wit, 50,000, so that the law will become general and not special. It is not reasonably to be expected that in the near future it can apply to enough counties to make the law applicable and general in any particulars. Making the law applicable to Charleston county alone is unreasonable.

The act in question is intended for Charleston county alone and cannot be anything other than a special law in violation of the plain inhibition of the Constitution. This is not in conflict with the decision in *State v. Berkeley*, 64 S. C. 194, 41 S. E. 961.

The reasonableness of the classification of the counties in drawing juries is different as to buying seed cotton. The General Assembly has passed a general act regulating the traffic in seed cotton, section 454 of Criminal Code, and we see no reason why Charleston county should have different legislation from the other counties in the State, and the opinion of Justice Gage in *Tisdale v. Scarborough,* 99 S. C. 377, 83 S. E. 594, is applicable here as to the disposition to legislate by delegation and the perniciousness of such legislation.

It is unnecessary to consider the other grounds.

The judgment is reversed.

MESSRS. JUSTICE HYDRICK and CIRCUIT JUDGES WILSON, MEMMINGER, SHIPP, SEASE, BOWMAN, TOWNSEND and McIVER, concur.

MR. CHIEF JUSTICE GARY, *dissenting.* This is an appeal from the sentence imposed upon the defendants for violation of the act of 1916, which provides:

"That the traffic by purchase, barter or exchange in all or any seed cotton, or unpacked lint cotton, whether long cotton, known as sea island cotton, short staple cotton, or any other class, kind, staple, grade or description of cotton whatsoever, within counties containing cities of fifty thousand inhabitants or more, in the State of South Carolina, between August 1st and December 31st of any year, is hereby declared against the public welfare, and is prohibited, and it shall be unlawful to issue any license for such purpose." Act February 15, 1916 (29 St. at Large, p. 656).

The charge was for the buying and selling of seed cotton. The defendants demurred to the indictment, on grounds that hereinafter will be considered.

The circumstances under which a legislative enactment should be declared unconstitutional are well expressed by Chancellor Waties, in delivering the opinion of the Court in *Byrne's Adm'rs v. Stewart's Adm'rs,* 3 DeSaus. 476, who says:

"It (legislative authority) is supreme in all cases in which it is not restrained by the Constitution; and as it is the duty of the legislators, as well as of the Judges, to consult this and conform their acts to it, so it ought to be presumed that all their acts are conformable to it, unless the contrary is manifest. This confidence in the wisdom and integrity of the legislature is necessary to insure a due obedience to its authority; for, if this is frequently questioned, it must tend to diminish that reverence for the laws which is essential to the public safety and happiness. I am not, therefore, disposed to examine with scrupulous exactness the validity of a law. It would be unwise to do so on another account. The interference of the judicial power with legislative acts, if frequent or on dubious grounds, might occasion so great a jealousy of this power, and so general a prejudice against it, as to lead to measures which might end in the total overthrow of the independence of the judiciary, and, with it, this best preservative of the Constitution. The validity of a law ought not, then, to be questioned, unless it is so obviously repugnant to the Constitution that, when pointed out by the Judges, all men of sense and reflection in the community may perceive the repugnancy. By such a cautious exercise of this judicial check, no jealously of it will be excited, the public confidence in it may be promoted, and its salutary effects be justly and fully appreciated."

The rule is thus stated in Cooley's Constitutional Limitations (6th Ed.) 216:

"When Courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies, requisite to give it force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable

doubt.   A reasonable doubt must be solved in favor of leg-
islative action, and the act be sustained.

"The question whether a law be void, for its repugnancy
to the Constitution, is, at all times, a question of much deli-
cacy, which ought seldom, if ever, to be decided in the
affirmative, in a doubtful case."

Similar views are thus expressed in *McLean v. Arkansas*,
211 U. S. 539, 29 Sup Ct. 206, 53 L. Ed. 315, and quoted
with approval in *Adams v. Tanner;* 244 U. S. 590, 37 Sup.
Ct. 662, 61 L. Ed. 1336, L. R. A. 1917f, 1163, Ann. Cas.
1917d, 973 :

"It is also true that the police power of the State is not
unlimited, and is subject to judicial review, and, when
exerted in an arbitrary or oppressive manner, such laws may
be annulled, as violative of rights protected by the Consti-
tution.   While the Courts can set aside legislative enact-
ments upon this ground, the principles upon which such
interference is warranted are as well settled as is the right of
judicial interference itself.   The legislature being familiar
with local conditions is, primarily, the judge of the necessity
of such enactments.   The mere fact that a Court may differ
with the legislature in its views of public policy, or that
Judges may hold views inconsistent with the propriety of the
legislation in question, affords no ground for judicial inter-
ference, unless the act in question is unmistakably and pal-
pably in excess of legislative power. * * * If there existed
a condition of affairs, concerning which the legislature of
the State, exercising its conceded right to enact laws for the
protection of the health, safety, or welfare of the people,
might pass the law, it must be sustained; if such action was
arbitrary interference with the right to contract or carry on
business, and having no just relation to the protection of the
public within the scope of legislative power, the act must
fail."

The exceptions raise two questions. The first is whether the act in question is in violation of articles III, section 34, subd. 9, of the State Constitution, which provides:

"In all other cases, where a general law can be made applicable, no special law shall be enacted."

In the case of *State v. Berkeley*, 64 S. C. 194, 41 S. E. 961, the Court had under consideration the question as to the constitutionality of the statute providing for the drawing of juries in counties containing a city or cities with 40,000 or more inhabitants. In disposing of that question, the Court said:

"Now as to the question, is it constitutional? By its terms it is a general act. Its application is to all counties in this State which are blessed with a city or cities of 40,000 inhabitants. Laws are enacted alone for the immediate circumstances of a State. It is the part of wisdom to look ahead—to lay foundations upon which this people may expect in the future to build. No doubt the capital of the State—our beautiful and progressive Columbia—may soon fill the requirements as to population. So, too, the cities of the Piedmont—Greenville and Spartanburg—they may soon find themselves with the requisite population required by this act to be admitted to its privileges. While it is true that the county of Charleston alone, of our counties, has a city of 40,000 inhabitants, yet it is not named in the act; it should be allowed to enjoy its advantages of superior numbers in population. I do not see that this act of 1900 contravenes the provisions of article III, section 34 of our Constitution, which forbids the General Assembly 'to enact local or special laws. * * *' The mistake, as I take it, made by the appellant, is in assuming that because the county of Charleston happens to fill the requirements, while just now no other county in the State does so, no other counties in the future will do so. If it was an impossibility or an improbability that other counties would do so, then there might be some ground for calling this a local law."

15—111

The foregoing decision was thus construed in *State v. Hammond*, 66 S. C. 219, 44 S. E. 797 :

"In the case of *State v. Berkeley*, 64 S. C. 194 (41 S. E. 961), this Court held the act (23 Stat. 320), providing for drawing jurors in counties containing 40,000 inhabitants, or more, was a general law, notwithstanding there was one county, Charleston, in which the conditions of the statute immediately existed, inasmuch as the law was intended to operate throughout the State in all counties then falling or to fall within the disignated class of counties, or to all counties alike wherein the statutory conditions existed, or should thereafter exist. For example, a law protecting oyster beds by penalties is not local or special, but is general, even though there be few localities in the State where oyster beds exist, because the law operates throughout the whole State, wherever and whenever the conditions named in the statute may exist."

To the same effect is the case of *Budd v. New York*, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, in which the Court said :

"It is further contended for the plaintiffs in error that the statute in question violates the fourteenth amendment, because it takes from the elevator owners the equal protection of the laws, in that it applies only to places which have 130,000 population, * * * and thus operates against elevator owners in the larger cities of the State. The law operates equally on all elevator owners in places having 130,000 population or more; and we do not perceive how they are deprived of the equal protection of the laws, within the meaning of the fourteenth amendment."

The rule is thus stated in 6 R. C. L., section 380 :

"In some of the States, there are provisions in their Constitutions which require that laws should have a uniform operation throughout the State. Such provisions have been interposed to mean a uniform operation as to all persons and things, in the same condition or category; so that when-

ever a law is available in every part of the State, as to all persons and things in the same condition or category, it is of uniform operation throughout the State. For example, a law does not violate the requirements as to the equal protection of the laws, merely because its operation is confined to cities having a designated population, or upwards."

The rules by which a classification is to be tested are thus stated in *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912c, 160:

"(1) The equal protection clause of the fourteenth amendment does not take from the State the power to classify in the adoption of police law, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and, therefore, is purely arbitrary.

"(2) A classification having some reasonable basis does not offend against that clause, merely because it is not made with mathematical nicety. * * *

"(3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts * * * must be assumed.

"(4) One who assails the classification in such a law must carrry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

These authorities clearly show:

(1) That a classification based on population will be regarded as reasonable, unless those assailing it satisfy the Court that it is essentially arbitrary; the burden being on them.

(2) That the statute was enacted for a public purpose, which appears upon the face thereof, as it declares that the traffic in seed cotton is against the public welfare. The public nature of the statute is also shown, by the case of *Tisdale v. Scarborough,* 99 S. C. 377, 83 S. E. 594, in which it is said:

"Cotton, and that includes its seed, is the staple product of the State. * * * The whole policy * * * is bound up in the growing, the sale, and the manufacture of cotton."

(3) That the statute does not prohibit, but is a mere regulation of, the traffic in cotton, in certain stages of its preparation for the usual condition, in which it is generally marketed. Before it is in a condition to be manufactured, cotton is, first, gathered or picked in the seed, then ginned and packed in bales. The statute does not prohibit the traffic in cotton, between the periods mentioned in the statute, provided it has passed through the conditions of ginning and picking; but it does prohibit the traffic, while it is in the condition of seed cotton, for the very good reason that the opportunities are then best for stealing it and concealing the thief.

In the case of *Davis v. State,* 68 Ala. 58, 44 Am. Rep. 128, the Court held that a statute making it unlawful within certain counties to transport or move, after sunset and before sunrise, any cotton in the seed, was constitutional. In commenting on that decision, the Court, in *Budd v. New York,* 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, used the following language:

"Against the argument that the statute was such a despotic interference with the rights of private property as to be tantamount, in its practical effect, to a deprivation of ownership, 'without due process of law,' the Court said that the statute sought only to *regulate and control* the transportation of cotton *in one particular condition of it,* and was a mere *police regulation,* to which there was no constitutional objection, citing *Munn v. Illinois* (94 U. S. 113, 24 L. Ed. 77). It added that the *object of the statute was to regulate traffic in the staple agricultural product of the State, so as to prevent a prevalent evil, which, in the opinion of the law-making power, might do much to demoralize agricultural*

*labor and to destroy the legitimate profits of agricultural pursuits, to the public detriment, at least within the specified territory."*

We desire to call special attention to the words which we have italicized, as they unquestionably show that the statute was not intended to "prohibit," but merely to "regulate," the traffic in cotton.

(4) That the opportunities for the unlawful traffic in seed cotton are greater in counties having large cities than in other counties, for the reason that the traffic may be carried on with more secrecy. And it may be said that, generally, the larger the city, the greater is the opportunity for concealment of the traffic. The legislature had the right to exercise its discretion in determining the extent of the population in the cities that would bring the counties within the provisions of the statute.

Under the statute, every county in the State, where cotton is raised, will have greater protection, as soon as it has a city of 50,000 inhabitants. We have not been able to find a single case in which the exercise of such discretion has been held to be discriminatory; nor has any case been cited to that effect.

The other question presented by the exceptions is whether the statute is obnoxious to the provisions of the fourteenth amendment of the Federal Constitution, and of article I, section 5 of the State Constitution.

The principles which we have already announced show that the exceptions raising this question cannot be sustained.

For these reasons, I dissent.

MESSRS. JUSTICE FRASER and CIRCUIT JUDGES DEVORE, FRANK B. GARY and MAULDIN concur.