In the Matter of NEW YORK STATE LICENSED BAIL AGENT'S ASSOCIATION, INC., et al., Petitioners, against JOHN M. MURTAGH, as Chief City Magistrate of the Magistrates' Court of the City of New York, et al., Respondents.

Supreme Court, Special Term, New York County, September 19, 1951.

*Frank R. Klein, David Goldstein* and *Lawrence Kovalsky* for petitioners.

*John P. McGrath, Corporation Counsel (Victor J. Herwitz* and *Morris Himmelfarb* of counsel), for respondents.

DICKSTEIN, J. This article 78 proceeding brings under review a rule adopted by the Board of City Magistrates. The petitioners are a membership corporation, an association of professional bondsmen, and one of its members. It is alleged that such bondsmen are licensed and supervised by the Superintendent of Insurance. In the course of their business they appear in and attend daily sessions and sittings of the Magistrates' Courts, furnish bail, give and write bonds. Thus they perform, it is alleged, a legal and necessary service and pursue a business sanctioned by law, all of which requires use of the facilities of the various court houses and clerks' offices, with access thereto, and to the sittings and sessions of the courts.

Pursuant to the power conferred in section 91 of the New York City Criminal Courts Act to make rules regulating practice and procedure, the Board of Magistrates adopted on May 12, 1948, rule 52 as follows: " 52. Except for the purpose of executing a bond or other papers needful for the furnishing of bail or other security for the appearance of a particular defendant or for the purpose of appearing before a City Magistrate in connection with his obligation as a bondsman or for the purpose of obtaining information of the disposition of a case in which he has executed a bail bond, no bondsman or any of his representatives shall be in or about any Court, nor shall he remain in or about any Court longer than necessary to accomplish such purposes." As a result, it is alleged that access to facilities of the court houses and of the clerks' offices of the Magistrates' Courts and permission freely to attend its sessions and sittings have been denied to the association's membership.

Thus it is claimed rule 52 is discriminatory and invalid and is in conflict with section 4 of the Judiciary Law, which is as

follows: " 4. *Sittings of courts to be public.* The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court." The rule, it is claimed, is unreasonable and unnecessary to reach any dereliction arising on the part of any professional bondsman in the pursuit of his business. It is thus contended as a matter of law that rule 52 is invalid in that this particular area of regulation is pre-empted by section 4 of the Judiciary Law, and the power to adopt regulatory rules conferred by section 91 of the New York City Criminal Courts Act does not extend to the class of regulations under review. Finally, the rule is unreasonable and therefore an invalid exercise of power in that it needlessly cripples a lawful business without prior attempt by legitimate regulation to reach and prohibit specific abuses.

We are told that the challenged rule was promulgated to meet and remedy a scandalous and disgraceful condition resulting from the unsavory and nefarious character of solicitors with powers for furnishing bail bonds, together with their questionable connections and general flagrant operations. The existence of such a situation has not recently been brought by any official body to public attention, probably because of the salutary effect of the rule under attack. The shocking and alarming condition was, however, the subject of several earlier official investigations. The first of these was reported March 28, 1932. In his report Honorable SAMUEL SEABURY stated: " The bail bond business, as it now exists is a scandalous and unnecessary evil. * * * It has been shown beyond all doubts that the contacts between bondsmen and the underworld are numerous and, probably, inevitable, from the very nature of the business."

The June 6, 1941, report of the Amen investigation stated: " Thus, in the bail bond field the individual licensed as a professional bail bondsman operates substantially without supervision or regulation. The most lucrative business for a professional bail bondsman is the business of organized crime. * * * Thus his acquaintanceships and contacts extend on the one hand among members of the organized underworld and on the other hand to members of the Police Department and Employees of the Courts. Because of these contacts and the nature of the business by which he earns his livelihood the pro-

fessional bail bondsman is a potential corrupting influence and his activities should be subject to constant supervision and regulation.''

The Seabury report stated further:

'' The Bondsman as Extortioner, Fixer and Corruptionist.

'' In the course of the investigation, it has become strikingly clear that the bondsmen are exceedingly important factors in the administration of business in the Magistrates' Courts. As appears from some of the cases already referred to, the bondsman played the part of a general factotum. With meticulous care he arranged every detail of the way out of the labyrinth of justice. He served as a sort of general agent for his client, frequently employing the lawyer, looking after witnesses, and, in many cases, himself providing the expert management necessary to ' fix ' the various persons indispensable in the business of bringing about the failure of prosecution. With his extraordinarily varied connections the bondsman constituted a sort of clearing house between the underworld and the realm of lawfulness. The elimination of these people from the process of administering justice in the Magistrates' Courts would be an important and far-reaching forward step. * * * The ease with which many bondsmen functioned unmolested, as perhaps the vital factor in the shocking ring which existed in connection with the Women's Court, demonstrates not only that the business tends to attract neither admirable nor honest men, but that it is in itself sordid and dangerous.''

The report dated March 8, 1948, of the investigation of the Grand Jury of the County Court, Kings County, recommended as follows:

'' (a) No bondsman should at any time, directly or indirectly, advise any person for whom he gives bail as to any matter concerning the conduct of the case.

'' (b) A professional bail bondsman or his representative should only appear in court when on official business.

'' (c) Professional bail bondsmen and their representatives should be prohibited from loitering in the court or corridors of the court.

'' (d) Professional bail bondsmen or their representatives should be prohibited from soliciting defendants or any one in their behalf.

'' (e) The office of the professional bondsman should be located at least 1,000 feet from the court house or building where courts convene and the place of business should be licensed.

" (f) Professional bondsmen and lawyers should not share the same office space."

A situation was thus presented which required broad action upon a scale which transcends the correction by enforcement of law of separate instances of wrongdoing when and if discovered. To meet it, the respondents deemed it wise and expedient to adopt rule 52. In the main, the contention of petitioners is answered in *People* v. *Hall* (51 App. Div. 57). The court was there called upon to interpret section 5 of the Code of Civil Procedure, the predecessor statute to section 4 of the Judiciary Law. The Federal and State Constitutions and the laws of the several States indeed guarantee speedy and public trials. It was stated, however, in *People* v. *Hall* (*supra,* p. 61) : " That principle [the protection of a public trial] must be upheld unimpaired, but its retention does not entirely wrest from the trial judge the discretion to conduct the trial in such wise as to be consonant with good morals and common decency and in an orderly manner ", and further (pp. 62–63) : " Two things are engrafted on our Code of Criminal Procedure (§ 8, subd. 1) for the benefit of the defendant — a *speedy* trial and a *public* trial. To make effectual the former requirement the court must necessarily exercise its discretion. What constitutes a speedy trial is not fixed by the statute in days or months. It depends upon the circumstances of each particular case. It is left with the court to determine whether that important right has been denied to the defendant. By parity of reasoning the court must decide whether or not the defendant has been denied a public trial. That is a term of some elasticity as well as the other. * * * The statute is for his [defendant's] benefit, and such an expulsion does not harm or aid him. It is apparent, therefore, that while the defendant is entitled to a public trial, good morals or the exigencies of the situation may make that a relative term without injury to the defendant and without infringement upon the sanctity of the rights granted to him; that such discretion is vested in the presiding judge, and the test is whether or not it has been abused."

The question is whether the rule is within the spirit of the statute as thus interpreted. If a Judge singly can, in his discretion and in a liberal interpretation of the statute, take action of exclusion, it would seem that the Board of Magistrates could do likewise. Naturally its field of action is likely to be broader and more embracing and its action can be struck down only if it is unnecessarily discriminatory and overshoots the

mark. The court finds that the statute does not preclude regulation of attendance at sessions and sittings and that the adoption of such regulatory rule is not in conflict with statute nor beyond the power to regulate. Such regulation is not limited to exclusion by a sitting Magistrate for misconduct occurring before him, such as drunkenness, noise, breach of the peace and similar offenses.

The paramount purpose of section 4 of the Judiciary Law is the protection of the defendant as well as the public interests. This was well stated in Cooley on Constitutional Limitations (8th ed., p. 647) as follows: " It is also requisite that the trial be *public*. By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials; * * *. The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, nothwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether."

That the exercise of power at the local level must not conflict with statute is well grounded in the law. The standards of application are somewhat elastic where the statute is adjudged to require liberal rather than literal interpretation. Thus the cases relied on by petitioners are not germane here. In *People ex rel. Nassoit* v. *Young* (195 App. Div. 513) a rule adopted by the Justices of the Municipal Court was challenged. It provided for the venue of a certain class of cases and such provision was adopted pursuant to section 8 of the New York City Municipal Court Code, which granted the power to adopt and amend rules. Section 17 of the code, however, had made other provision for the venue of actions, including the class under consideration. The rule was thus held invalid as in contravention of legislative provision. There was there, however, no room for interpretation but for literal construction merely of a precise statute which left no room for discretion. *Stevenson* v. *News Syndicate Co.* (276 App. Div. 614) was an action in libel based upon a report of a judicial proceeding. Section 337 of the Civil Practice Act provides: " A civil action cannot be maintained against any person, firm or corporation, for the

publication of a fair and true report of any judicial, legislative or other public and official proceedings ''. Rule 278 of the Rules of Civil Practice, made pursuant to section 83 of the Judiciary Law, provides for the sealing of records of and exclusion of the public from the trial of proceedings in an action to annul a marriage or for divorce or separation. The proceeding reported in the *Stevenson* case was a matrimonial action in which the papers were sealed. The court held that there was no conflict between the statute and the rule. The statute does not purport to define the proceedings which are public or the papers to which the public has a right of access. There remained the inherent right to balance the convenience and advantage of the public and the convenience and right of the individual. *Matter of Kress & Co.* v. *Department of Health* (283 N. Y. 55) is for the same reasons inapplicable.

We come to the conclusion therefore that the Board of Magistrates could regulate attendance at sittings and sessions and nevertheless keep inviolate the right of a defendant to a public trial and the interest of the public therein without conflict with statute, provided that the action taken was not discriminatory or otherwise invalid. Petitioners contend such invalidity exists. The nature of the contention is tantamount to a claim that the professional bondsman has been restricted if indeed his business has not been destroyed. The principle here urged is expounded in *Good Humor Corp.* v. *City of New York* (290 N. Y. 312). The opinion there states (pp. 317–321) :

'' Certainly that power is not broad enough to prohibit use of the street for a lawful business, recognized by statute, for the sole purpose of protecting rent payers and taxpayers against competition from others who do not pay rent or taxes. The object of the Local Law as declared in the report of the Committee on General Welfare is not an object which a city has constitutional power to make effective. (*People* v. *Kuc,* 272 N. Y. 72; *People* v. *Cohen,* 272 N. Y. 319.) That would not necessarily render the Local Law invalid if the local legislative body had other or additional purposes which it had constitutional power to make effective. The statement of the purpose of the Local Law in the committee report is not conclusive. The question here presented is whether the Local Law is reasonably calculated to promote such ' other or additional purposes.' (*Stephenson* v. *Binford,* 287 U. S. 251, 276.)

" We assume that even ' the harmless pursuit of a lawful private business ' on the public streets of New York may be interdicted by the legislative body in order to put an end to ' an undesirable invasion of, or interference with, the full and free use of the highways by the people in fulfillment of the public use to which streets are dedicated.' (*Valentine* v. *Chrestensen*, 316 U. S. 52, 54.) In their answer the defendants have pleaded that the Local Law was adopted to remedy harmful conditions which, they allege, are the results of peddling in the streets of New York. At the trial they offered evidence intended to sustain these allegations. The inference might reasonably be drawn from such evidence that *some* ' itinerant peddlers ' are unclean in their habits and are ' irresponsible, insolent, unfair and abusive in the manner in which they conduct their business; that at times *some* fraudulently use defective scales and measures; that *some* keep and store their merchandise and offer it for sale in unsanitary manner; and that in *some* crowded streets and especially at approaches to bridges peddlers and peddlers' carts impede traffic. Doubtless the Legislature might adopt reasonable measures to prevent abuses in connection with licensed peddling; we may assume that the Legislature might even authorize a city by local law to refuse to license any peddlers and to stop all peddling if complete prohibition rather than regulation of peddling is a reasonable measure to stop abuses. It would none the less be a drastic method of ending abuses; — a method that may be used only where the abuses are general and difficult to control by regulation and where they cause or threaten injury to the public so serious that the Legislature might reasonably find it outweighs the harm that would be caused to some by complete prohibition. (*Adams* v. *Tanner*, 244 U. S. 590; *Tolliver* v. *Blizzard*, 143 Ky. 773.) The fundamental question remains whether prohibition rather than regulation in this case is reasonable.　＊　＊　＊

" An ordinance which prohibits a business so conducted because others conduct a similar business in manner which creates conditions which the public should not be compelled to tolerate, is patently unreasonable, at least where it does not appear that discrimination between the harmful and the harmless is impractical and that the public interest may be served better by complete prohibition than by further attempts at regulation.　＊　＊　＊

" Contumacious disregard of the law and abuse of legal rights by some will justify curtailment of the legal rights of

those who do not abuse them only where there is reasonable ground for a legislative finding that discrimination between the useful and the harmful is impractical. That does not appear in this case.''

Rule 52 does indeed severely restrict the activities of the bondsman. His business is not destroyed or prohibited. We are not, however, told what are the functions of the bondsman, how he operates or may be reasonably and validly permitted to operate in furnishing services to those entitled to receive them. Clear it is that the decorum of the courtroom and its environs is guaranteed. It is not made to appear, however, that defendants, whose protection is also sought, are not bereft of such protection or of any substantial part of the necessary service of the bondsman which a defendant may properly desire to secure. An issue remains whether the rule in its very beneficial objective has not in actual fact overshot the mark in a manner so drastic as to be unjustified. Is any serious harm done and, if so, does the evil sought to be eliminated outweigh the harm done? Are the abuses so general and difficult to control by regulation that the remedy of rule 52 is proper? Is discrimination between the harmful and harmless impractical and the interests of defendants and of the public better served by the almost total exclusion of the rule? It is not suggested that the court is of the opinion that the rule is unnecessarily onerous. Indeed, the impression is gained that regulations short of the one adopted could not be safely tried and that the nature of the operation may not permit of practical discrimination between the harmful and the harmless. More complete record, however, should be available to answer the several questions noted, and, accordingly, a trial of the issues is deemed in order.

The motion is granted to the extent of directing the issuance of an intermediate order accordingly.

The respondents in their answer have pleaded eight separate defenses. The fourth, based on section 1286 of the Civil Practice Act, is not available. The remaining defenses need not be considered for if the trial produces a finding that adoption of rule 52 was a reasonable, proper and valid exercise of power in all circumstances, then the petition must be dismissed as the claim of conflict is otherwise not sustained. Settle order.