# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0657

════════════

ASHISH PATEL, ANVERALI SATANI, NAZIRA MOMIN, MINAZ CHAMADIA, AND VIJAY LAKSHMI YOGI, PETITIONERS/CROSS-RESPONDENTS,

v.

TEXAS DEPARTMENT OF LICENSING AND REGULATION, ET AL., RESPONDENTS/CROSS-PETITIONERS,

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

CHIEF JUSTICE HECHT, joined by JUSTICE GUZMAN and JUSTICE BROWN, dissenting.

This is one of those cases in which, once the Court has decided whom it wants to win, the less said the better. Result is an inapt tool for shaping principle; it's supposed to work the other way around. And when principle ends up being mutilated, it can no longer be used to guide other results. Since it turns out that the Court thinks substantive due process means whatever judges say it means, it would be best to leave bad enough alone rather than pretend the idea has any support in the Constitution's text or history. The Court runs the risk that what passes for constitutional analysis around here will be seen as just picking words out of the air.

The Threaders deserve to have the yoke of the regulatory state thrown off, the shackles on their free enterprise shattered, in short—although brevity is not the hallmark of some of today's

writings—to stick it to the man. And what better way to do all that than by having judges hold the State's 80-year-old cosmetology licensing scheme, also found in ten other states, unconstitutional as applied to eyebrow threading. The trouble is, this Court, like the United States Supreme Court, has repeatedly held that a statute with a rational basis does not violate substantive due process, and applying that standard here will not help the Threaders. Casting about, the Court comes up with "oppressive", a brand-new entrant in the substantive due process lexicon. Neither this Court nor any other the Court can find has ever used "oppressive" as a test for substantive due process. Which is great because the Court is now free—as free as the grateful Threaders from public health and safety regulation—to make up substantive due process from scratch.

Whether eyebrow threaders need 750 hours' training, or only 430, or 40, or 1, to practice their trade on the public is not for us to say, as long as the Legislature, whose job it is to say, is making a rational effort to protect public health and safety. As the Court acknowledges at one point, "it is not for courts to second-guess [legislative and agency] decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers."[1] The question for us is whether, by requiring 750 hours' training, the Legislature has violated substantive due process by depriving eyebrow threaders of their fundamental liberty without the due course of law guaranteed by the Texas Constitution.

Because the final authority to interpret and apply the Constitution belongs to the Judiciary, only the people themselves, by constitutional amendment, can alter the Court's substantive due

---

[1] *Ante* at ___.

2

process decisions. The Judiciary's authority is enormous and not lightly to be exercised. Justice Powell once observed that "[t]he history of substantive due process counsels caution and restraint."[2] The history to which he referred was the Supreme Court's own adventure with substantive due process beginning with *Lochner v. New York*,[3] in which the Court abrogated a state statute as "unreasonable, unnecessary and arbitrary",[4] and ending with *United States v. Carolene Products Company*,[5] in which the Court established that a statute with any rational basis will be upheld. The Court disregards the federal courts' experience with substantive due process in *Lochner* and its progeny, invents a new test unprecedented in American jurisprudence, and ushers in a new era of government by judges.

The Court, and JUSTICE WILLETT'S concurring opinion in its wild championing of economic liberty, seem oblivious to the reality that social liberty is no less important. The same substantive due process that can free eyebrow threaders from onerous training requirements can also be used to establish a right of privacy not otherwise to be found in the Constitution.[6] Are restrictions on abortion "oppressive"? How about restrictions on marriage? Unconstrained by any meaningful standard, substantive due process allows judges to define liberty according to their personal policy

---

[2] *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) (citations omitted).

[3] 198 U.S. 45, 58–59 (1905).

[4] *Id.* at 56.

[5] 304 U.S. 144, 152 (1938).

[6] *See, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479 (1965).

preferences. History and reason warn that the Court has gone too far.

I respectfully dissent.

# I

The Legislature has regulated cosmetic services for 80 years. The original impetus was concern for public health and safety. "[T]he public," the Legislature found in the Cosmetology Act of 1935, "is daily exposed to disease due to insufficient care as to sanitation and hygiene [and should be protected by the Act] from inexperienced and unscrupulous beauty parlors and beauty culture schools".[7] Protection of the public health and welfare remains the driving force for regulating cosmetology.[8] Beauty schools, salons, and practitioners are subject to "sanitation rules to prevent the spread of an infectious or contagious disease",[9] inspections to ensure compliance,[10] and investigation

---

[7] Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, § 26, 1935 Tex. Gen. Laws 304, 311, *amended by* Act of Nov. 14, 1935, 44th Leg., 2d C.S., ch. 469, §§ 1–2, 1935 Tex. Gen. Laws 1846, 1846–1848. The 1935 Act and its successor provisions were codified first as article 734b in the former Penal Code, later as former article 734c, then "transferred" to former article 8451a of the Texas Revised Civil Statutes, which was in turn replaced by Chapter 1602 of the new Occupations Code. *See* Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 49, 1971 Tex. Gen. Laws 3389, 3402 (adopting a new Penal Code and repealing former articles); Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 5, 1973 Tex. Gen. Laws 883, 995, 996a, 996c (adopting a new Penal Code and transferring certain provisions to the Revised Civil Statutes); Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182–2206, 2439–2440 (adopting the Occupations Code, including Chapter 1602, and repealing former article 8451a); *see also* Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01–.02, 2005 Tex. Gen. Laws 2734, 2735, 2759–2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602).

Before 1935, a statute required registration, but not licensing, of "beauty parlor" owners and operators, imposed certain health and cleanliness requirements, and set fines for statutory violations. *See* Act of 1921, 37th Leg., R.S., ch. 79, 1921 Tex. Gen. Laws 155, 155–158, codified in TEX. PEN. CODE arts. 728–733 (Vernon's 1925).

[8] *See* House Comm. on Gov't Org., Bill Analysis, Tex. S.B. 384, 66th Leg., R.S. (1979) ("The need for regulation has primarily been based on the protection of the public health and welfare."); House Comm. on Public Health, Bill Analysis, Tex. S.B. 127, 69th Leg., R.S. (1985) ("The need for regulation has primarily been based on the protection of the public health and welfare.").

[9] TEX. OCC. CODE § 1603.102.

[10] *Id.* §§ 1603.103, 1603.104.

of public complaints.[11] The 1935 Act made it unlawful to practice, provide, or teach cosmetology—broadly defined to include any practice for beautifying the upper body[12]—without a license.[13] Applicants were required to complete 1,000 hours of training at a licensed school of beauty culture and pass an examination.[14]

In 1971, the Legislature rewrote the Act. An expanded definition of cosmetology specifically included "removing superfluous hair from the body by use of depilatories[15] or tweezers".[16] The revised Act was more discriminating, creating five classes of licenses with different restrictions on the activities in which a holder could engage.[17] Training requirements ranged from 1,500 hours down to 150 hours,[18] and applicants had to pass written and practical examinations.[19] Since then, the

[11] *Id.* § 51.252; *see also id.* § 1603.151.

[12] Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, § 3(a), 1935 Tex. Gen. Laws at 304, codified as former TEX. PEN. CODE art. 734b, § 3(a) ("Any person who with hands, or mechanical or electrical apparatus or appliances, or by the use of cosmetological preparations, antiseptics, tonics, lotions or creams, engages in any one or combination of the following practices for remuneration or pay, to-wit: cleansing, beautifying, or any kindred work of the scalp, face, neck, arm, bust, or upper part of the body or manicuring the nails of any person, shall be construed to be practicing the occupation of a cosmetologist.").

[13] *Id.* § 1, 1935 Tex. Gen. Laws at 304, codified as former TEX. PEN. CODE art. 734b, § 1.

[14] *Id.* §§ 9, 11(a), 1935 Tex. Gen. Laws at 306–307, codified as former TEX. PEN. CODE art. 734b, §§ 9, 11(a).

[15] A depilatory is "a cosmetic for the temporary removal of undesired hair". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 605 (2002).

[16] Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 1(3)(C), 1971 Tex. Gen. Laws 3389, 3389, codified as former TEX. PEN. CODE art. 734c, § 1(3)(c).

[17] *Id.* §§ 13–17, 1971 Tex. Gen. Laws at 3392–3394, codified as former TEX. PEN. CODE art. 734c, §§ 13–17.

[18] *Id.*

[19] *Id.* §§ 4(d), 13–17, 1971 Tex. Gen. Laws. at 3391–3394, codified as former TEX. PEN. CODE art. 734c §§ 4(d), 13–17.

Legislature has repeatedly adjusted the kinds of licenses and the training requirements for each.[20]

There are now six classes of licenses with required training ranging from 1,500 hours to 320 hours.[21]

In 2005, the Legislature assigned the regulation of cosmetology to the Texas Department of Licensing and Regulation ("the Department"),[22] "the primary state agency responsible for the oversight of businesses, industries, general trades, and occupations that are regulated by the state and assigned to the department by the legislature."[23] The Department is managed by an executive director[24] and governed by the Texas Commission of Licensing and Regulation ("the Commission").[25] The Commission is comprised of seven members appointed by the Governor and confirmed by the Senate,[26] each of whom must be "a representative of the general public."[27] The Commission soon became aware of the practice of eyebrow threading, and in 2008 it began to insist that threading be included in the regulatory scheme like other forms of hair removal. In a 2011 case,

---

[20] *See, e.g.*, Act of May 28, 1979, 66th Leg., R.S., ch. 606, § 1, 1979 Tex. Gen. Laws 1340, 1343–1344 (amending former TEX. REV. CIV. STAT. art. 8451a, §§ 10–12); Act of May 27, 1991, 72d Leg., R.S., ch. 626, § 11, 1991 Tex. Gen. Laws 2260, 2265 (adding § 13A to former TEX. REV. CIV. STAT. art. 8451a); Act of May 27, 2011, 82d Leg., R.S., ch. 1241, §§ 15–17, 2011 Tex. Gen. Laws 3319, 3325–3326 (amending TEX. OCC. CODE § 1602.257 and adding §§ 1602.2571, 1602.2572, and 1602.261).

[21] TEX. OCC. CODE §§ 1602.254–.2572, 1602.261, *amended by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717, *available at* http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pdf.

[22] Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01–.02, 2005 Tex. Gen. Laws 2734, 2735, 2759–2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602); *see* TEX. OCC. CODE § 1603.002.

[23] TEX. OCC. CODE § 51.051(a).

[24] *Id.* §§ 51.101, 51.103.

[25] *Id.* § 51.051(b).

[26] *Id.* § 51.052(a).

[27] *Id.* § 51.053(a).

the court of appeals was skeptical of the Department's position,[28] but after the decision issued, the Legislature amended the definition of cosmetology to include "removing superfluous hair from a person's body using depilatories, preparations, or *tweezing techniques*".[29] The Department then amended its regulations to define "tweezing techniques" as "the extraction of hair from the hair follicle by use of . . . an instrument, appliance or implement . . . made of . . . thread or other material."[30]

The Department requires an esthetician specialty license for threading.[31] The license covers various skin care treatments such as facials and cleansing, "beautifying a person's face, neck, or arms" with preparations or other products, and removing superfluous hair from the skin.[32] An applicant for an esthetician specialty license must complete 750 hours of instruction in a licensed beauty culture school,[33] half the hours required for an "operator license" allowing the performance

---

[28] *Kuntz v. Khan*, No. 03-10-00160-CV, 2011 WL 182882, *7–8 (Tex. App.—Austin, Jan. 21, 2011, no pet.) (mem. op.)*, available at* http://www.search.txcourts.gov/Case.aspx?cn=03-10-00160-CV&coa=coa03. In an interlocutory appeal from the trial court's partial denial of the governmental defendants' plea to the jurisdiction and temporary injunction barring defendants from taking any action to further investigate, regulate, or otherwise disrupt Khan's business, the Department argued that eyebrow threading constitutes the practice of cosmetology in three ways: threading involves "beautifying a person's face" using an "appliance", "administering a facial treatment", and "removing superfluous hair from a person's body using depilatories". *See* TEX. OCC. CODE §§ 1602.002(7), 1602.002(8), 1602.002(9). In affirming the temporary injunction, the court of appeals concluded, *inter alia*, that the trial court reasonably determined that Khan had shown "a probable right to recovery based on the plain language of the statute". *Khan*, 2011 WL 182882, at *8.

[29] Act of May 27, 2011, 82d Leg., R.S., ch. 1241, § 12, 2011 Tex. Gen. Laws 3319, 3323–3324 (emphasis in original) (amending TEX. OCC. CODE § 1602.002(a)(9) to substitute "tweezing techniques" for "mechanical tweezers").

[30] 37 Tex. Reg. 681, 681 (Feb. 10, 2012), codified at 16 TEX. ADMIN. CODE § 83.10(36).

[31] TEX. OCC. CODE § 1602.257 (eligibility for esthetician specialty license).

[32] *Id.* § 1602.257(a) (setting out the services that the holder of an esthetician license is authorized to perform).

[33] *Id.* § 1602.257(b)(3).

of "any practice of cosmetology."[34] The instruction for an esthetician specialty license covers the

following subjects[35]:

```
orientation, rules and laws. . . . . . . . . . . . . . . . . . . . . . . . . . 50 hours
sanitation, safety, and first aid. . . . . . . . . . . . . . . . . . . . . . 40 hours
anatomy and physiology.. . . . . . . . . . . . . . . . . . . . . . . . . . . 90 hours
facial treatment, cleansing, masking, therapy. . . . . . . . . . 225 hours
superfluous hair removal. . . . . . . . . . . . . . . . . . . . . . . . . . 25 hours
electricity, machines, and related equipment. . . . . . . . . . . . 75 hours
makeup. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75 hours
chemistry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 hours
care of client.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 hours
management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35 hours
aroma therapy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15 hours
nutrition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 hours
color psychology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 hours
```

Depending on the school, the training can take from nine to sixteen months and cost anywhere from

$3,500 for a public junior college to $22,000 for a private school. Threading is not a required part

of the curriculum, which generally covers "superfluous hair removal", and only a handful of schools

offer instruction in threading. Health, safety, and sanitation issues are covered as part of the first five

subjects listed above; these subjects account for 430 of the prerequisite hours.

An applicant must also pass a written and a practical examination.[36] The examinations test

on safety, sanitation, and disinfectant criteria as well as the ability to perform various services. Hair

---

[34] *Id.* §§ 1602.254(a) (permitting "any practice of cosmetology"), (b)(3) (required hours).

[35] 16 TEX. ADMIN. CODE § 83.120(b) (esthetician curriculum).

[36] *Id.* §§ 83.20(a)(6), (b)(6), 83.21; *see also* TEX. OCC. CODE §§ 1602.254(c)(3), 1602.262(a)(2).

removal is part of the practical exam, though threading is not, but an applicant may use threading to demonstrate her hair-removal ability.[37]

Cosmetology regulations require eyebrow threaders, like other cosmetologists, to wash their hands or use a liquid hand sanitizer before performing any services on a customer; dispose of all single-use items that have come in contact with the client's skin; store thread in sealed bags or covered containers and in a clean, dry, and debris-free storage area; and clean, disinfect, and sterilize or sanitize all multi-use items prior to each service.[38] Regulations further require cosmetologists and estheticians to clean the client's skin before performing hair removal services.[39] Special precautions must be taken with items such as creams, astringents, lotions, and other preparations, which are subject to possible cross-contamination.[40] Single-use items used to apply these products—such as tissue, cotton pads, or cotton balls—must be discarded in a trash receptacle that is emptied daily and kept clean by washing or using plastic liners.[41] Facial chairs, beds, and headrests must be cleaned and

---

[37] Petitioners argue that they could not do so because the examinee is required to "hold the [client's] skin taut" while removing the hairs, and the threading technique requires two hands. But the record shows that it is nevertheless necessary that the client's skin be held taut during threading and that the usual practice is to direct the client to hold her own skin taut during the threading process. The record does not tell us whether or not this would suffice during the examination.

[38] 16 TEX. ADMIN. CODE §§ 83.102(c), (d), (f), 81.104(a), (d), (e), 83.105(a), (c), (e), (f).

[39] *Id.* § 83.105(b).

[40] *Id.* § 83.104(g).

[41] *Id.* §§ 83.102(i), 83.104(e).

disinfected before service is provided to a client.[42] Regulations also provide specific procedures to follow whenever a cosmetology service causes bleeding.[43]

The Threaders acknowledge that threading poses health risks. In the trial court, they offered evidence from a physician, Dr. Patel (no relation to Petitioner Ashish Patel), that removing a hair from its follicle opens a portal through which bacteria or a virus can permeate the skin. Dr. Patel opined that threading may lead to "redness, swelling, itching, inflammation of the hair follicles, discoloration, and . . . superficial bacterial and viral infections." She testified that threading could cause the spread of infections such as flat warts, skin-colored lesions known as molluscum contagiosum, pink eye, ringworm, impetigo, and methicillin-resistant staphylococcus aureus (often called a "staph infection"). She opined that a threader's failure to use appropriate sanitation practices—such as using disposable materials properly, cleaning the work station, using effective hand-washing techniques, and correctly treating skin irritations and abrasions—can expose threading clients to infection and disease. She also testified that these health risks can be fully addressed by giving threaders one hour's training in sanitation and hygiene.

The Threaders allege that, as applied to them, the cosmetology licensing scheme violates substantive due process—that is, that it deprives them of economic liberty without due course of law in violation of Article I, Section 19 of the Texas Constitution. The Threaders assert that Texas' regulation of cosmetology "places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." But the Threaders acknowledge that Texas'

[42] *Id.* § 83.104(c).

[43] *Id.* § 83.111.

10

longstanding regulation of cosmetology, including superfluous hair removal, is needed to protect the public health. They argue only that it is excessive.

**II**

On our record, Texas' regulation of threading seems excessive and misguided as a matter of policy, though I hasten to add, nothing of what prompted the regulation is before us. We have conducted no investigations and held no hearings. As in any case, we know what the parties have told us, and nothing more. This distinguishes the Judiciary from the Legislature. We are ill-equipped to set policy because we have no way of summoning the various interests for input or exploring all considerations. But on this record, threading regulation is obviously too much.

Is it also unconstitutional? Federal and Texas constitutional protections of due process are closely related. The Fifth Amendment to the United States Constitution, adopted by Congress in 1789 and ratified by the states two years later, provides that no person shall "be deprived of life, liberty, or property, without due process of law".[44] The Fourteenth Amendment, ratified in 1868, prohibits the states from violating the same guarantee.[45] In between, in 1845, the first Constitution for the State of Texas provided that "[n]o citizen of this State shall be deprived of life, liberty, [or] property . . . except by due course of the law of the land."[46] The provision is now Article I, Section 19 of the Texas Constitution.

---

[44] U.S. CONST. amend. V.

[45] U.S. CONST. amend. XIV, § 1.

[46] TEX. CONST. OF 1845, art. I, § 16.

**A**

This Court has recognized that Texas' due course of law guarantee protects both procedural and substantive rights.[47] But we have been mindful that applying substantive due process doctrine to economic regulation has never met with recognized success. The United States Supreme Court has vacillated in its view of the scope of federal due process protection. In *Lochner v. New York*, the Supreme Court famously took a broad view, holding that New York's regulation of bakers' working hours violated the Fourteenth Amendment.[48] Finding an implicit right of contract in the United States Constitution, the Supreme Court concluded that whether the state regulation deprived bakers of this right depends on whether it is:

> a fair, reasonable, and appropriate exercise of the police power of the state, or [rather] an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family[.][49]

Justice Oliver Wendell Holmes dissented, warning:

> This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law[.] It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. . . .

---

[47] *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 632 (Tex. 1996).

[48] 198 U.S. 45, 58–59 (1905).

[49] *Id.* at 56.

Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.[50]

Subsequent cases proved true Holmes' warning that a mere reasonableness standard for substantive due process was unworkable and that judges cannot practically or legally constitutionalize economic theory.[51] *Lochner*'s substantive due process adventure soon ended.

Thirty-three years later, the Supreme Court recanted *Lochner*, stating matter-of-factly, as if it should always have been obvious:

regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed, it is of such a character as to preclude the assumption that it rests upon some rational basis . . . .[52]

---

[50] *Id.* at 75–76 (Holmes, J., dissenting).

[51] *See, e.g.*, *New State Ice Co. v. Liebmann*, 285 U.S. 262, 278 (1932) (striking down a state law prohibiting the sale of ice without a permit as unreasonable because the sale of ice was not a "public business" that could be so regulated); *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105, 113–114 (1928) (prohibition on anyone not a licensed pharmacist owning a pharmacy or drug store struck down because the state had not shown a "reasonable relationship to the public health"); *Adams v. Tanner*, 244 U.S. 590, 596–597 (1917) (finding a statute prohibiting employment agencies from demanding or receiving fees from workers "arbitrary and oppressive" and "unduly restrict[ive]"); *Bunting v. Oregon*, 243 U.S. 426, 433–434, 438 (1917) (law that prohibited employees in factories from working more than 10 hours a day, or 13 hours a day if paid overtime, upheld as a reasonable exercise of the police power). *Compare Adkins v. Children's Hosp.*, 261 U.S. 525, 559 (1923) (minimum wage requirement for women is an unconstitutional intrusion on freedom of contract, not proper exercise of the police power), *with W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399–400 (1937) (minimum wage requirement for women and children is proper exercise of police power, as a means of protection for those "in an unequal position with respect to bargaining power"); *compare Muller v. Oregon*, 208 U.S. 412, 416, 423 (1908) (limitation on hours worked in "any mechanical establishment, or factory, or laundry" by women upheld as a valid exercise of the police power aimed at the protection of women), *and Holden v. Hardy*, 169 U.S. 366, 395 (1898) (limitation on hours worked in underground mines a valid exercise of the police power for the protection of those employed in a dangerous profession), *with Lochner*, 198 U.S. at 58 (limitation on hours worked in a bakery is not a valid exercise of the police power).

[52] *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938).

This requirement that economic regulation need only bear a rational relationship to a legitimate state interest is far more deferential to state legislatures than *Lochner*'s reasonableness test. Later reflecting on the passing of the *Lochner* era, Justice Douglas wrote for the Supreme Court:

> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. . . . For protection against abuses by legislatures the people must resort to the polls, not to the courts.[53]

**B**

The United States Constitution does not, of course, prohibit the states from experimenting with substantive due process based in their own constitutions,[54] and Texas has done a bit of that. Twenty years ago we summarized the case law thusly:

> Texas courts have not been consistent in articulating a standard of review under the due course clause. Our courts have sometimes indicated that section 19 provides an identical guarantee to its federal due process counterpart. Under federal due process, a law that does not affect fundamental rights or interests—such as the economic legislation at issue here—is valid if it merely bears a rational relationship to a legitimate state interest. On other occasions, however, our Court has attempted to articulate our own independent due course standard, which some courts have characterized as more rigorous than the federal standard.[55]

But, in the decades since the federal courts adopted the rational basis test, we have not wandered far from that standard. Even in *State v. Richards*—the case relied on principally by the Threaders to

---

[53] *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955) (citations omitted) (quoting *Munn v. Illinois*, 94 U.S. 113, 134 (1876)).

[54] *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 74–78 (1872).

[55] *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 525 (Tex. 1995) (citations omitted) (internal quotation marks omitted); *see also Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 263 & n.5 (Tex. 1994).

support heightened scrutiny of economic regulation—the Court's reasoning and result were deferential to the legislation at issue. We concluded that a provision authorizing forfeiture of a vehicle that had been used in furtherance of a crime without the owner's knowledge did not contravene the Texas Constitution.[56] We explained:

> A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.[57]

Though we did not refer to the federal rational basis test, our analysis was consistent with it.

For the past 20 years, we have consistently adhered to the rational basis test. In *Barshop v. Medina County Underground Water Conservation District*, we upheld water regulations against a substantive due process challenge as "rationally related to legitimate state purposes in managing and regulating this vital resource."[58] In *City of San Antonio v. TPLP Office Park Properties*, we applied the rational basis test to city street regulations.[59] We explained that the proper inquiry "is whether the actions rationally could have been related to a proper exercise of its police power."[60] And in *Mayhew v. Town of Sunnyvale*, we upheld a zoning ordinance, explaining:

---

[56] *State v. Richards*, 301 S.W.2d 597, 599–600, 602–603 (Tex. 1957) (on certified questions from court of civil appeals).

[57] *Id.* at 602.

[58] 925 S.W.2d 618, 631–633 (Tex. 1996).

[59] 218 S.W.3d 60, 65 (Tex. 2007) (per curiam).

[60] *Id.*

15

> A generally applicable zoning ordinance will survive a substantive due process challenge if it is designed to accomplish an objective within the government's police power and if a rational relationship exists between the ordinance and its purpose. This deferential inquiry does not focus on the ultimate effectiveness of the ordinance, but on whether the enacting body could have rationally believed at the time of enactment that the ordinance would promote its objective. If it is at least fairly debatable that the decision was rationally related to legitimate government interests, the decision must be upheld. The ordinance will violate substantive due process only if it is *clearly* arbitrary and unreasonable.[61]

Under our precedent, a clearly arbitrary and unreasonable regulation is one that has no rational relationship to its purpose in furthering a legitimate state interest.

The Court instead opts to concoct an entirely new standard from the differing terminology used in our precedents. To avoid violating substantive due process, a statute must not be "clearly arbitrary and unreasonable", must be sufficiently "rational and reasonable", must "strike [] a fair balance" between the legislative purpose and individual rights, must be "justified", and must not be "oppressive" or "in contravention of common right".[62] Put all these words in a blender and out pours the correct standard: a statute must not be "so unreasonably burdensome that it becomes oppressive". Reasonable burdensomeness is okay. And I think the Court really means *unduly* oppressive, as distinguished from the oppressiveness of the government in general. The analysis would be laughable if the consequences were not so serious.[63] One cannot distill a single test from common elements of the rational basis and "fair balance" standards; one must choose between them. Instead,

---

[61] 964 S.W.2d 922, 938–939 (Tex. 1998) (emphasis in original) (citations omitted).

[62] *Ante* at ___.

[63] As we recently observed in a different setting, "the test for determining whether something is oppressive will necessarily vary from one context to the next, and thus the term has multiple meanings, depending on the circumstances." *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014).

the Court breeds a strict, deferential standard with a loose, non-deferential one, and the resulting

misbegot is . . . loose and non-deferential.

While substantive due process has been the subject of many cases and much study since

*Lochner*, the Court cannot find a Texas case, a case from an American jurisdiction, or a scholarly

treatise or article to cite in support of its "oppressive" test.[64] The obvious reason is that it is no

standard at all. Oppression is very much in the eye of the beholder. In this case, the Court takes into

account the amount, cost, and apparent usefulness of the required training, a threader's lost

income-earning opportunity, and the danger to public health and safety. I suppose the Court would

agree that it should also take into account the number and severity of incidents of harm due to poor

training and the benefit to threaders and the public. This process is what is generally referred to as

legislating. It should be done. It should not be done by judges.

The Court's answer is that a rational basis standard is no better because if, as in the present

case, the State could rationally require some training, the State could require an unlimited amount

of training.[65] The argument is nonsense. That some training is rational does not mean that more is.

There are no bright lines for setting a permissible training requirement under either test. The

---

[64] Three *Lochner*-era cases reference the impropriety of "arbitrary or oppressive" legislation, but not one uses the phrase as a formal test for substantive due process. *Adams v. Tanner*, 244 U.S. 590, 595–596 (1917); *McLean v. Arkansas*, 211 U.S. 539, 547 (1909); *accord Hous. & Tex. Cent. Ry. Co v. City of Dall.*, 84 S.W. 648, 653 (Tex. 1905) (noting that without justification, an "invasion of [] rights under the guise of [the State's police] power" would be properly characterized as "unreasonable, arbitrary, [or] oppressive"). The Court instead focused its *Lochner*-ian sights on the existence of a "just relation to the protection of the public within the scope of legislative power," and finding none, concluded that the legislature had overstepped its constitutional bounds. *Adams*, 244 U.S. at 596; *McLean*, 211 U.S. at 547; *cf. Hous. & Tex. Cent. Ry. Co*, 84 S.W. at 653.

[65] *Ante* at ___.

difference is that the rational basis standard invokes objective reason as its measure, while the "oppressive" test is nothing more than an appeal to a judge's predilections.

The subjectiveness of the Court's new test is clear from its response to the fact that Texas is not the only state that has concluded threading should be regulated as part of the practice of cosmetology or esthetics. Eight other states explicitly regulate threading in this way: Delaware, Hawaii, Illinois, Iowa, Louisiana, Mississippi, Oklahoma, and West Virginia.[66] Two others define cosmetology to encompass any type of superfluous hair removal.[67] These states each require aspiring cosmetologists and estheticians to complete hours of coursework in numbers similar to those required in Texas.[68] This is strong evidence that Texas' regulatory framework has a rational basis;

___

[66] 24 DEL. ADMIN. CODE § 5100-14.7 (listing "threading" as an example of "hair removal" and providing that "[h]air removal shall be performed by a licensed cosmetologist or licensed aesthetician only"); HAW. REV. STAT. § 439-1 ("'Esthetician' means any person who, with hands or nonmedically prescribed mechanical or electrical apparatus or devices . . . engages for compensation in . . . [r]emoving superfluous hair about the body of any person."); 225 ILL. COMP. STAT. 410 / 3-1 (cosmetology includes "removing superfluous hair from the body of any person by the use of depilatories, waxing, threading, or tweezers"); *id.* 410 / 3A-1(a)(3) (esthetics includes "removing superfluous hair from the body of any person"); IOWA CODE § 157.1(5)(c) ("'Cosmetology' means . . . [r]emoving superfluous hair from the face or body of a person with the use of depilatories, wax, sugars, threading, or tweezing"); *id.* § 157.1(12)(c) (esthetics includes "[r]emoving superfluous hair"); LA. REV. STAT. ANN. § 37:563(6) (esthetics includes "hair removal by cosmetic preparations, threading, waxing, or other similar means"); MISS. CODE ANN. § 73-7-2(b)(iv) (cosmetology includes "[a]rching eyebrows, to include tweezing, waxing, threading or any other methods of epilation"); *id.* § 73-7-2(d)(ii) (esthetics includes the same); OKLA. ADMIN. CODE § 175:10-9-55(a) ("Only licensed Facialist/Estheticians, Cosmetologists or Barbers may perform threading."); W. VA. CODE § 30-27-3(a)(4) (esthetics includes "[t]he waxing, tweezing and threading of hair on another person's body").

[67] 63 PA. CONS. STAT. § 507 (cosmetology includes "the removal of superfluous hair"); S.D. CODIFIED LAWS § 36-15-2(4) (the practice of cosmetology includes "removal of superfluous hair by nonpermanent means").

[68] Like Texas, Illinois and Louisiana require applicants for a cosmetology license to complete 1,500 hours of coursework. 225 ILL. COMP. STAT. 410 / 3-2(1)(c); LA. ADMIN. CODE tit. 46 § 301. And, like Texas, they require applicants for a more limited esthetician's license to complete 750 hours of coursework. 225 ILL. COMP. STAT. 410 / 3A-2(c); LA. ADMIN. CODE tit. 46 § 303. Delaware, Mississippi, and Oklahoma require applicants for a cosmetology license to complete 1,500 hours of coursework. DEL. CODE ANN. tit. 24 § 5107; MISS. CODE ANN. § 73-7-13; OKLA. ADMIN. CODE § 175:10-3-34. These states require applicants for an esthetics license to complete 600 hours of coursework. DEL. CODE ANN. tit. 24 § 5135; MISS. CODE ANN. § 73-7-18; OKLA. ADMIN. CODE § 175:10-3-39. Hawaii and West Virginia require 1,800 hours of coursework for cosmetology and 600 hours for esthetics. HAW. REV. STAT. § 439-12(b), (d); W. VA. CODE R. §§ 3-1-5.1, 3-1-9.1. Iowa and South Dakota require 2,100 hours of coursework for a cosmetology license

it is common to many states. The Court's response is "so what". The reasoned judgment of multiple

state legislatures is irrelevant to the Court because whether the training requirements are excessive

and oppressive depends on what Texas judges think. The Court's "oppressive" test is pure judicial

policy.

As long as judicial policy is made in the name of substantive due process, the Court argues,

it is judging, not legislating. But the Court cannot, simply by invoking a constitutional doctrine,

mask the true policy-making character of its ruling. One could take the Court's analysis of the costs

and benefits of regulating eyebrow threaders and offer it in evidence at a legislative hearing, only

there would also be evidence relating to the needs of the public and the cosmetology industry

generally, evidence that the Court does not have and cannot weigh. The substantive due process

doctrine empowers the Judiciary to check regulation that is a clearly arbitrary deprivation of

economic liberty in violation of due course of law. The rational basis test for making this

determination is not a disclaimer of judicial responsibility but a legal and practical recognition that

"[t]he wisdom or expediency of the law is the Legislature's prerogative, not ours."[69]

---

and 600 hours for an esthetics license. IOWA CODE § 157.10(1); IOWA ADMIN. CODE r. 645.61.14, S.D. ADMIN. R. 20:42:06:09, 20:42:06:09.02. Pennsylvania requires 1,250 hours of coursework for a cosmetology license and 300 hours for an esthetics license. 63 PA. CONS. STAT. §§ 510(a)(3), 511(b)(1). Some states allow aspiring cosmetologists and estheticians to complete an apprenticeship in lieu of or in combination with classroom work. *See, e.g.*, DEL. CODE ANN. tit. 24 § 5107(a)(3)(b)–(c); HAW. REV. STAT. § 439-12(b), (d); 63 PA. CONS. STAT. §§ 510(a), 510.3, 516; S.D. ADMIN. R. 20:42:07:06–07.

[69] *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995) (quoting *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968)).

## III

That the Court has gone where no one has gone before is proudly declared by JUSTICE WILLETT'S concurring opinion. Gone are the constraints of the rational basis standard, a standard dismissed as a "rubber stamp" and a "judicial shrug". JUSTICE WILLETT'S rhetorical torrent against economic regulation carries along its ultimate demand: Texas judges must conduct an investigation "asking" what the "government [is] actually up to", weighing "what policymakers *really* had in mind at the time," "scrutin[izing]" "actual assertions with actual evidence."[70] All this *Sturm und Drang* announces a new day. And to be sure, all this "asking" and "scrutiniz[ing]" is not judicial activism. It is merely judicial un-passivism.

I agree with JUSTICE WILLETT about one thing: "[t]his case concerns far more than whether Ashish Patel can pluck unwanted hair with a strand of thread."[71] It is about a dramatic arrogation of power by the Court. Economic regulation is invalid whenever a majority of this Court feels it is oppressive.

Hair stylists could make the same argument the Threaders do: why should they be required to have instruction and examination in facial treatment, manicuring, massage, and the removal of unwanted hair? Whether to create various licensing classification schemes, and which practices to include within each, have been questions central to cosmetology regulation since 1971. It is the kind of line-drawing that the Legislature and the Department, not courts, are equipped to do. More

---

[70] *Ante* at ___ (emphasis in original).

[71] *Ante* at ___.

importantly, the Constitution gives this line-drawing power—this policymaking—to the Legislature and the Executive, not to the Judiciary.

The same issue applies to other occupational regulation. There is an ongoing debate regarding whether law school should have a third year, whether students should be allowed to sit for the bar exam earlier, and whether a lawyer should be allowed to obtain a special, limited-practice license with less instruction. Further, students intent on pursuing a particular area of practice—tax law, for example—question why they should be required to take other courses, including those, like civil procedure, thought to be part of a fundamental first-year curriculum. Medical education is similarly questioned. Why should students intent on confining their practice to particular areas or specialities be required to take unrelated courses? The answer is often that subjects unrelated to a particular field of practice are nevertheless part of the background information important to the discipline. But even when this rationale is lacking, substantive due process is not violated merely because medical education is not tailor-made for each student. Our inquiry is whether the cosmetology licensing scheme is unconstitutional, not whether we think the lines chosen by the Legislature are well-placed as a matter of policy.

And while *Lochner* justified judicial invalidation of economic regulation in the name of substantive due process to protect a liberty interest grounded in an implied constitutional right to contract, liberty is not solely, not even primarily, an economic concept. Other constitutional rights have been found by implication in our constitutions.[72] Scholars argue that the right to privacy implied

---

[72] For a recent discussion of the development of substantive due process and the fundamental rights it has been held to protect, *see* Joshua D. Hawley*, The Intellectual Origins of (Modern) Substantive Due Process*, 93 TEX. L. REV. 275, 280, 328–334 (2014) (discussing the demise of the *Lochner*-era police powers jurisprudence and its replacement

by the United States Supreme Court in the federal Constitution provides the basis for protecting personal liberty from social regulation.[73] The Court's power grab will not be limited to the "regulation of economic interests",[74] but will be wielded in future cases against all manner of legislation, maybe not by members of this Court, but by others who see today as precedent. The *Lochner* monster, rediscovered and unleashed by the Court, will stray far from the Judiciary's proper sphere of authority—and to places far afield of the economic realm to which the Court is sympathetic. Judicial usurpation of authority over the State's policies may provide protection for the economic liberties on which the concurrence waxes eloquent, but it also gives rise to such decisions as *Roe v. Wade*.[75] JUSTICE WILLETT applauds the Court for "narrow[ing] the difference" between fundamental rights—a varsity team (to use his metaphor) that includes not only rights protected by the First Amendment, but also privacy-based liberty interests discovered solely in the due process clause itself—and the economic interests asserted here. JUSTICE WILLETT'S concurring opinion fills the Court's sails and sets a *Lochner*-ian course.

---

with modern fundamental-rights jurisprudence, and arguing that this shift occurred because the Supreme Court came to find "personal moral choice" and "self-development"—such as the "right of privacy" the Court protected in *Roe v. Wade*, 410 U.S. 113, 153 (1973)—to be more "compelling" types of liberty than the private property protections that were the aim of the *Lochner* era).

[73] *See, e.g.*, David. E. Bernstein, Lochner *Era Revisionism, Revised:* Lochner *and the Origins of Fundamental Rights Constitutionalism*, 92 GEO. L.J. 1, 60 (2003) (arguing that "*Lochnerian* fundamental rights analysis returned in mutated form" in modern fundamental-rights decisions striking down laws as violative of "unenumerated due process rights"); David N. Mayer, *Substantive Due Process Rediscovered: The Rise and Fall of Liberty of Contract*, 60 MERCER L. REV. 563, 640–642 (2008) (discussing the liberty of contract cases that were used as groundwork for the Supreme Court's later protections of a "right to privacy").

[74] *Ante* at ___.

[75] 410 U.S. 113 (1973).

## IV

I would apply the test established by our precedent: regulation is unconstitutional only if it lacks a rational relationship to a legitimate government interest.[76] The parties' evidence, the State's purpose in its regulatory scheme, and the effects of that regulation are all to be considered.[77] But our precedent makes clear that judges are not to weigh the evidence to determine whether the State's purpose and approach are reasonable or whether they will be successful; the role of judges is instead to decide whether, in light of the evidence presented, the enacting body "could have rationally . . . decided that the measure might achieve the objective."[78] Unlike the Court's "oppressive" test, this inquiry is objective, looking not to whether the governmental body subjectively believed the purpose would be accomplished, but to whether a reasonable governmental body could have so believed in light of the evidence. It is not for the Judiciary to correct a mere error in judgment by the policymaking branches.

The Threaders do not dispute that, in general, Texas' long-standing regulation of

---

[76] *See City of San Antonio v. TPLP Office Park Props.*, 218 S.W.3d 60, 64–66 (Tex. 2007) (per curiam); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938–939 (Tex. 1998); *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 631–633 (Tex. 1996); *State v. Richards*, 301 S.W.2d 597, 602–603 (Tex. 1957).

[77] In *Barshop*, we considered the entire record in determining that (1) the State has a legitimate purpose in regulating the use of water in the Edwards Aquifer, which is a scarce resource; and (2) that the challenged provisions were rationally related to the State's "purposes in managing and regulating this vital resource." 925 S.W.2d at 625, 633. We explained that, because *Barshop* was a facial challenge, "we should presume" the existence of any facts under which the Act would be constitutional "without making a separate investigation . . . or attempting to decide whether the Legislature has reached a correct conclusion with respect to the facts." *Id.* at 625. This presumption exists because a facial challenge requires the challenger to show that the challenged regulation is unconstitutional under "any possible state of facts." *Id.* Although this burden is high, a plaintiff challenging a law on its face nevertheless has the opportunity to put on evidence that the challenged law is unconstitutional in all possible applications.

[78] *TPLP Office Park Props.*, 218 S.W.3d at 64–65 (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 n.3 (1987)).

23

cosmetology is rationally related to the State's legitimate interest in protecting public health and safety.[79] The Threaders argue only that the regulation as applied to eyebrow threading—specifically, the training and testing required for licensure—is so excessive as to deprive them of their liberty in choosing an occupation. The State does not dispute that as many as 320 of the required 750 hours are not useful to eyebrow threaders,[80] but it argues that the requirements are not clearly arbitrary, as they must be to violate substantive due process under the correct test.

The health risks of commercial hair removal cannot be minimized. Dr. Patel, the expert offered by the Threaders in the trial court, testified that avulsive hair removal opens a portal through which bacteria can enter the body through the skin. For this reason, she explained, she trains threaders in her medical spa to use an antiseptic on the eyebrow area before beginning the threading process and to apply an astringent to the skin after the process is complete. The astringent helps to close up the hair follicle to make it difficult for bacteria to enter. Patel testified that she also trains threaders on methods of keeping their work area clean, keeping the thread sanitary, and on the importance of always using a new piece of thread (and any other single-use items) on each client. She testified that threaders may need to be able to identify skin infections or other conditions that would make threading unsafe for a particular client. Patel recognized that threading may lead to the

---

[79] We note that Texas has regulated a related practice, barbering, since 1907. Act of Apr. 18, 1907, 30th Leg., R.S., ch. 141, 1907 Tex. Gen. Laws 273. We have twice held that regulation of barbering is important to public health and safety. *Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll.,* 454 S.W.2d 729, 731 (Tex. 1970); *Gerard v. Smith*, 52 S.W.2d 347, 350 (Tex. Civ. App.—El Paso 1932, writ ref'd).

[80] At oral argument, the State agreed that "430 hours of the 750-hour curriculum are addressed to subject matter relevant to eyebrow threading" and explained that it "has not argued that the remaining 320 hours of instruction are [] necessary."

spread of various contagious bacterial and viral infections and that a threader's failure to utilize appropriate sanitation can further expose threading clients to infection and disease.

Applicants for a general cosmetology license or an esthetician speciality license are instructed in general sanitation and safety practices, and each of the specific procedures they learn incorporates the hygiene and safety practices pertinent to that procedure. If they attend a school that teaches threading, they learn to apply these concepts specifically to that practice, and if instead they attend a school that does not instruct in threading, they nevertheless learn these safety implications and requirements as applied to other avulsive forms of hair removal. Moreover, although there is evidence that only a few cosmetology schools currently teach threading, the Legislature could reasonably have concluded that more schools will teach it as demand for the procedure grows. Although there is evidence that no more than an hour of sanitation training is necessary for threading, there is other evidence from which the Legislature could reasonably conclude that the required instruction and testing would further its goal of protecting public health and safety through the regulation of cosmetology.

\*    \*    \*    \*    \*

Texas' cosmetology regulation as applied to threading is, to quote Justice Holmes, "injudicious", though I would not go so far as to say "tyrannical", and certainly not clearly arbitrary. I would hold that the regulation is rationally related to the State's legitimate interest in protecting the health and safety of the public.

The Court pooh-poohs the *Lochnerian* "monster". A word of caution: those who cannot remember the past are condemned to repeat it.[81]

I would affirm the judgment of the court of appeals. Accordingly, I respectfully dissent.

Nathan L. Hecht
Chief Justice

Opinion delivered: June 26, 2015

---

[81] I GEORGE SANTAYANA, THE LIFE OF REASON: REASON IN COMMON SENSE 284 (Charles Scribner's Sons, 2d ed. 1929).